**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| WESTERN RESERVE LIFE ASSURANCE COMPANY OF OHIO, | |
| Plaintiff/Counterclaim-Defendant, | No. C-04-81-LRR |
| vs. | |
| G. RANDALL BRATTON, GARY G. BRATTON, BRATTON FINANCIAL SERVICES CORPORATION and BRATTON INTERNATIONAL, INC., | **ORDER** |
| Defendants/Counterclaim-Plaintiffs, | |
| vs. | |
| AEGON USA, INC., | |
| Counterclaim-Defendant. | |

_____

*TABLE OF CONTENTS*

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

III.   *JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.    *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *A.     Corporate Structure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *B.     The Brattons and the Appointment Agreements* . . . . . . . . . . . . . . **5**
      *C.     WRL's Decision Makers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      *D.     Re-Branding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
      *E.     The Proposal and Negotiations* . . . . . . . . . . . . . . . . . . . . . . . . **9**
      *F.     Kirby's Remarks* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
      *G.     The Commission Schedule* . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
      *H.     Additional Communications Regarding the Brattons' Work* . . . . . . **16**

    I.     *The Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**V.**   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . **20**

**VI.**  **SUMMARY JUDGMENT ANALYSIS** . . . . . . . . . . . . . . . . . . . . **21**
    A.    *Piercing the Corporate Veil* . . . . . . . . . . . . . . . . . . . . . . . . . **21**
    B.    *The Brattons' Breach of Contract Claims* . . . . . . . . . . . . . . . . . . **22**
        1.    *Whether the Appointment Agreements are fully-integrated
               agreements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
             a.    *Gary Bratton's Appointment Agreement* . . . . . . . . . . **23**
             b.    *Randy Bratton's Appointment Agreement* . . . . . . . . . **24**
        2.    *The oral contract* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
             a.    *The statute of frauds* . . . . . . . . . . . . . . . . . . . . . . **25**
             b.    *Elements of breach of contract* . . . . . . . . . . . . . . . . **27**
             c.    *Whether the oral contract is terminable at will* . . . . . . **32**
    C.    *The Brattons' Promissory Estoppel Claim* . . . . . . . . . . . . . . . . . **35**
        1.    *Whether Randy Bratton's Appointment Agreement preempts
               a claim of promissory estoppel* . . . . . . . . . . . . . . . . . . . . **36**
        2.    *Whether the Brattons can establish a claim of promissory
               estoppel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
    D.    *The Brattons' Misrepresentation Claims* . . . . . . . . . . . . . . . . . . **39**
        1.    *Negligent misrepresentation* . . . . . . . . . . . . . . . . . . . . . . **39**
        2.    *Fraudulent misrepresentation* . . . . . . . . . . . . . . . . . . . . . **42**
    E.    *The Brattons' Quantum Meruit and Unjust Enrichment Claim* . . . . **45**
        1.    *Unjust enrichment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**
        2.    *Implied-in-fact contract for services (quantum meruit)* . . . . . **48**

**VII.** **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**

### I. INTRODUCTION

The matter before the court is the Motion for Summary Judgment (docket no. 99) ("Motion") filed by Plaintiff/Counterclaim-Defendant Western Reserve Life Assurance Company of Ohio ("WRL") and Counterclaim-Defendant AEGON USA, Inc. ("AEGON").

## II.  PROCEDURAL BACKGROUND

On June 26, 2004, WRL filed a complaint in this court seeking declaratory judgment.  On January 31, 2005, Defendants Randall G. Bratton ("Randy Bratton"), Gary G. Bratton ("Gary Bratton"), Bratton Financial Services Corporation and Bratton International, Inc. (hereinafter collectively referred to as "the Brattons") filed an answer and counterclaims.  On April 14, 2005, the Brattons filed an amended answer, counterclaims and a third-party complaint, adding AEGON Financial Partners as a third-party defendant.  On April 21, 2005, WRL filed an answer to the counterclaim.  On July 27, 2005, the Brattons filed a Second Amended Answer and Counterclaims and Jury Demand ("Second Amended Complaint") against WRL and AEGON.[1]  On August 1, 2005, WRL and AEGON filed another answer.

On January 13, 2006, WRL and AEGON filed the instant Motion.  On February 13, 2006, the Brattons filed a Resistance to the Motion.  On February 22, 2006, WRL and AEGON filed a Reply to the Brattons' Resistance.

A hearing on the Motion was held on April 20, 2006.  Attorneys Amy L. Reasner and Wilford H. Stone represented WRL and AEGON.  Attorney Jason Gregory Wolfkill represented the Brattons.  Finding the Motion to be fully submitted and ready for decision, the court turns to consider it.

## III.  JURISDICTION

WRL claims there is diversity jurisdiction, pursuant to 28 U.S.C. § 1332.  On January 10, 2005, this court adopted a November 17, 2004 Report and Recommendation in which Chief Magistrate Judge John A. Jarvey determined that the court has diversity

---

[1]  In the April 14, 2005 third-party complaint, the Brattons named AEGON Financial Partners as the third-party defendant.  In the Second Amended Complaint, they replaced AEGON Financial Partners with AEGON.

subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). The court found that the amount in controversy exceeds $75,000. Moreover, the court found that the parties are diverse because Gary Bratton and Randy Bratton reside in Tennessee; Bratton Financial Service Corporation and Bratton International, Inc. are Delaware corporations with their principal places of business in Memphis, Tennessee; and WRL is incorporated in Ohio with its principal place of business in Cedar Rapids, Iowa. Therefore, the court is satisfied that it has jurisdiction over this matter.

## IV. FACTS

### A. Corporate Structure

WRL is an insurance company that is qualified and licensed to transact business in Iowa. AEGON is a holding company, not an insurance company. AEGON owns WRL. AEGON does not have agents who are licensed to sell insurance or annuities, it does not recruit agents and it does not sell or offer insurance, annuities or any other products.

In late 2002 or 2003, the administrative, actuarial and legal activities of several AEGON-affiliated companies, including WRL, Life Investors Insurance Company of America ("Life Investors"), Peoples Benefit Life Insurance ("Peoples Benefit"), Transamerica Occidental ("Transamerica") and Monumental were consolidated under the name "AEGON Financial Partners." Pursuant to the formation of AEGON Financial Partners, one person is responsible for the administrative activities of the five affiliated companies, one person is responsible for the actuarial activities the companies and one person is responsible for the legal activities of the companies.

AEGON is affiliated with several companies, including: WRL, Life Investors, Transamerica and Peoples Benefit. Each AEGON-affiliated company issues identical insurance products under their respective names to build more distribution networks for AEGON insurance product sales. Employees from each of these AEGON-affiliated

companies sell insurance products from each of the other AEGON-affiliated company brands.

## B. The Brattons and the Appointment Agreements

Gary Bratton and his son, Randy Bratton, own equal shares of Bratton Financial Services Corporation and Bratton International, Inc.[2] Gary Bratton is the chief executive officer of both companies and both are brokerage general agencies. Randy Bratton and Gary Bratton have fifty-three years of collective experience in the insurance business.

On November 1, 2002, Randy Bratton entered into a four-page "Appointment Agreement" ("Randy Bratton's Appointment Agreement") with "the life insurance company which is an affiliate of the AEGON Insurance Group (the 'Company')," namely, WRL. Randy Bratton also received a signed commission schedule for fixed annuities entitled "Field Marketing Organization Commission Schedule for Fixed Annuity Contracts: WRL Freedom Multi-Year Guarantee." This schedule was signed by Randy Bratton on November 1, 2002. On March 20, 2003, a WRL representative signed a "Schedule for Appointment Agreement, Pattern I," which Randy Bratton received from WRL. This additional schedule also lists only annuity products.

Randy Bratton's Appointment Agreement has a "Termination Without Cause" section which, in pertinent part, reads:

> This Agreement will terminate on the earliest occurrence of any of the following events: (a) Termination without cause . . . This Agreement will be terminated without cause as follows: (1) By either party giving a written notice mailed or delivered to the last address of the other party, at least thirty (30) days

---

[2] Many of the documents involved in the Motion refer to "IMG International, Inc." IMG International, Inc., was the predecessor corporation to Bratton International, Inc.

> prior to the date of termination or earlier upon mutual agreement[.]

It further provides: "This Agreement and Schedule form the entire agreement between the Company and yourself. This Agreement terminates and replaces any prior agreement between the Company and yourself."

On July 2, 2003, Gary Bratton signed a two-page appointment agreement with "the Member of the AEGON Insurance Group (the "**Company**") that signs a schedule . . . ." ("Gary Bratton's Appointment Agreement"). Gary Bratton's Appointment Agreement was a form used by WRL in its Cedar Rapids, Iowa, office. The appointment agreement, in part, reads:

> This Appointment Agreement will terminate on the earliest occurrence of the following events: . . . the 30th day after the date of a written notice of termination . . . that Company may send to you . . . for a reason other than one described elsewhere in this section 6 or for no reason; . . .
>
> This Appointment Agreement and a Schedule form the entire agreement between the Company and yourself concerning matters covered by this Appointment Agreement and that Schedule. This Appointment Agreement terminates and replaces any prior agreement between the Company and yourself concerning matters covered by this Appointment Agreement.

In Gary Bratton's Appointment Agreement the term "Company" is defined as "AEGON Insurance Group." Gary Bratton received a letter from a WRL contract administrator which indicated that the "effective date" of his appointment was July 2, 2003, and provided an "agent number." Gary Bratton never received a signed schedule from WRL in conjunction with his appointment agreement.

6

## C. WRL's Decision Makers

From approximately 2000 to 2004, Mike Kirby ("Kirby") served concurrently as chairman and chief executive officer of WRL and Life Investors. His responsibilities were defined by reference to certain "distribution channels" for insurance products, and they did not include all business aspects of WRL and Life Investors. During that period, Kirby also had some responsibility for the operation of other insurance companies affiliated with AEGON, including Monumental, Peoples Benefit and Transamerica. Until his resignation as chief executive officer of WRL, Kirby reported to AEGON's chief executive officer, Pat Baird, and Kirby assumed that Pat Baird was the only person who had ultimate authority for all business aspects of WRL. Beginning in February 2004, Kirby was no longer employed by WRL and Seth Miller ("Miller") assumed some of Kirby's job responsibilities.

On March 1, 2003, John Kneeland ("Kneeland") became WRL's Vice President of Life Sales. On January 1, 2006, Kneeland also began serving as an employee of Inner Securities, Inc., a broker/dealer affiliated with AEGON. Kneeland was affiliated with Life Investors for over thirty-one years, serving as Director of Life Sales for two or three years prior to January 12, 2006. While he was the Director of Life Sales, Kneeland reported directly to Kirby.

Since 2000, Miller served concurrently as Vice President of Specialized Distribution for Life Investors and Vice President of Specialized Distribution for WRL. Miller previously held a similar position with Peoples Benefit.

From August 1998 to December 2005, Rick Seger ("Seger") served as Vice President of Advanced Sales for Life Investors. Since December 2005, Seger has served as Vice President of Specialized Distribution for Life Investors and reports to Tim

Stonhocker, an AEGON employee. Seger also works with independent marketing organizations ("IMOs") on behalf of Peoples Benefit.

### D. Re-Branding

In 2002 and 2003, WRL participated in a process of "re-branding" products offered by insurance companies affiliated with AEGON, including itself, Life Investors and Peoples Benefit. "Re-branding" means using the existing actuarial tables and contract of an existing life insurance product offered by one AEGON-affiliated company to create an identical product offered by a different AEGON-affiliated company. As a result of the re-branding process, certain fixed life insurance products[3] formerly offered by other AEGON-affiliated companies were re-branded as WRL products in 2003.

In November 2002, Kirby maintained a WRL office in Cedar Rapids and the Brattons resided in Tennessee. On November 7, 2002, the Brattons met with Kirby at WRL's Florida offices. Gary Bratton and Kirby discussed the possibility of re-branding certain fixed life products sold by other subsidiaries of AEGON as WRL products, bringing those products to market and growing the business over a five-year period. On November 8, 2002, Gary Bratton wrote Kirby a letter that stated:

> We are in the process of preparing a summary business plan which will discuss bringing the fixed life products to market and growing this business over the next five years. I hope we will have the opportunity of presenting this plan to you in person sometime in the next few weeks.

In a letter dated November 12, 2002, Kirby wrote the following to Randy Bratton:

---

[3] "Fixed life insurance products" means universal life or whole life insurance policies with a fixed crediting rate for the investment side of the contract. The court will hereinafter refer to these products as "fixed life products."

[WRL] is excited to share this new fixed product line introduction with experienced builders such as yourself. We were impressed with the quality of people we met, and their enthusiasm for creating this new partnership.

### E. The Proposal and Negotiations

On December 11, 2002, the Brattons presented Mr. Kirby with an eight-page document entitled "A Proposal for Western Reserve Life Assurance Company of Ohio for the Organization and Management of a Fixed Life Insurance Products Division" ("the Proposal"). The parties scheduled a meeting for January 15, 2003, in Memphis, Tennessee, to discuss the Proposal.

On January 15, 2003, the Brattons hosted a meeting ("January 2003 Meeting") at their offices in Memphis, Tennessee. The following WRL employees attended the January 2003 Meeting: Kirby, Kneeland and Paul Reaburn ("Reaburn"). At the January 2003 Meeting, the Brattons gave a PowerPoint slide presentation entitled "Marketing Partnership Proposal." One of the slides in the presentation provided the following:

**Proposal to WRL**

• Bratton Companies / IMG project WRL fixed life premium volume of $50,000,000 within five years

• Projections by Year:
  | | |
  |---|---|
  | Year One | $3,000,000 - $5,000,000 |
  | Year Two | $10,000,000 |
  | Year Three | $20,000,000 |
  | Year Four | $35,000,000 |
  | Year Five | $50,000,000 |

• Emphasis will be on <u>Quality</u> Business

• Projections are Very Achievable (Bratton Compaines / IMG production could amount to almost half of the Year Five

> projection with current distribution, assuming historic growth
> rate of 27%).

(emphasis in original). During the January 2003 Meeting, Kirby stated: "We have to have one organization heading up each of our distribution channels. We have the iGroup for Life Investors products and Life Professionals representing Peoples Benefit . . . . We like what we see; we hope this will be the last company that you will ever need."[4] Shortly after the January 2003 Meeting, Kirby gave Miller a copy of the Proposal and a copy of the slide presentation. Kirby and Miller discussed the substance of the meeting. After the January 2003 Meeting, WRL executives understood that the Brattons proposed to serve as an IMO with respect to WRL fixed life products.

In a letter dated January 17, 2003, Gary Bratton sent a letter to Kirby. The letter, in part, provides:

> We certainly enjoyed your visit to Memphis, and we appreciate your taking the time, along with [Reaburn] and [Kneeland] to come see us. When you have determined the best time for our conference call on Friday the 24th, please let us know. . . . Randy [Bratton], Charles [Roberts] and I have been tossing around some ideas about how best to roll out the new products for WRL. Hopefully, we can have some kind of game plan to you before our conference call.

On January 21, 2003, Gary Bratton sent Kirby a letter discussing plans to recruit agents and agencies to sell WRL's new fixed life products. Gary Bratton also enclosed a ten-page document entitled, "Proposed Game Plan for Fixed Life Products Introduction" ("Game Plan"). Miller saw a copy of the Game Plan sometime in 2003.

---

[4] In 2003, iGroup was the only IMO marketing fixed life products for Life Investors and Life Professionals was the only IMO marketing fixed life products for Peoples Benefit.

On January 24, 2003, the Brattons participated in a conference call with Kneeland and Miller in order to work out the details of the arrangement whereby the Brattons would market WRL fixed life products. Miller told the Brattons, "I have reviewed the presentation you made to our guys last week, and I can tell it's not your first day at the rodeo. Welcome to AEGON Financial Partners!" ("the Rodeo Remark"). Also, during the call, the Brattons asked Kneeland and Miller to provide them with a $15,000 marketing allowance each month. Kneeland informed the Brattons that they would need to speak with Kirby about the marketing allowance request.

On January 27, 2003, at 12:02 p.m., Gary Bratton emailed Kneeland. He wrote, in pertinent part: "We're delighted to be heading up the fixed life products division for WRL, and I assure you we'll do a good job for you!" Kneeland responded at 1:31 p.m., stating, in part: "Greetings Gary! We are also looking forward to having The Bratton Companies / IMG marketing the WRL 'fixed' products. 'Heading up the distribution for WRL' might be a little strong. (:-)" At 3:43 p.m., Gary Bratton responded as follows:

> My comment about our heading up the WRL fixed life distribution was meant to say that with the exception of your existing Aegon [sic] distribution, you would afford us the same consideration as you do the iGroup. As long as we're doing a good job for you, I would hope that you would not contract agents directly to the company and that you would refer agent inquiries to us. Also, as I mentioned in our presentation and conversation in Memphis[,] if you decide to contract any other group at our contract level, I would hope that you would give us some advance notice. If these are not your intentions, please let us know.

Neither Kneeland nor anyone else at WRL responded to Gary Bratton's last email. The January 27, 2003 email exchange between Gary Bratton and Kneeland formed part of the

basis for Gary Bratton's belief that the Brattons would be WRL's only national IMO and that the Brattons and WRL would have a long-term relationship.

In a letter dated February 14, 2003, Gary Bratton wrote to Kirby:

> On another matter, [Kneeland] asked that I deal with you directly on our request for the $15,000 monthly marketing allowance that we outlined in the business plan. . . . For the foreseeable future, substantially all of our travel expense will be incurred in building the WRL distribution, and our marketing director will spend 90-95% of her time in supporting our WRL recruiting efforts. I believe this is fair, please let me have your thoughts.

In April 2003, Gary Bratton and others from the Brattons traveled to Cedar Rapids to meet with WRL representatives. In a letter dated May 7, 2003, Miller and Kneeland wrote to the Brattons regarding this trip to Cedar Rapids and, in part, stated:

> It was also good to visit with you about a number of strategic issues as they relate to the distribution of WRL annuity and life products. To recap a few of the key points from the meeting:
>
> • As our CEO Mike Kirby said, we do not give exclusives. Currently, we have no one else marketing in the brokerage/IMO arena on WRL paper (either fixed life or annuity) outside of Bayfront, relationships brought to us by them, and our ISI distribution. Finally, it is our mission to continue to grow through new and existing distribution, and as always, today and in the future, this may be accomplished on WRL or other AEGON statutory carriers.

The letter further offered to advance the Brattons' future commissions in the amount of $15,000 per month, in lieu of a marketing allowance.

Gary Bratton made the following statement to Miller and Kneeland in a May 19, 2003 letter:

> We understand that we do not have an exclusive to market
> WRL fixed products, but we do hope that you will work with
> us to preserve the integrity of the contract for the mutual best
> interests of Western Reserve Life and IMG
> International. . . . As long as we are doing a good job for you
> and fulfilling the commitments that we have made to you, we
> ask that you do not give another organization the same contract
> that we have to market Western Reserve Life fixed life
> products.

In the same letter, the Brattons declined the $15,000 "advance" and stated, "we do not wish to borrow any money," but that "the marketing allowance is not a 'deal killer.'" Miller received the May 19, 2003 letter shortly after it was written. Neither Miller, Kneeland nor anyone else from WRL responded to the letter.

Also on May 19, 2003, Randy Bratton sent Kneeland and Miller an email requesting authorization for advertisement wording and regarding the proper way to refer to AEGON in the advertisement. Randy Bratton asked: "Should I try to get this approved by compliance and make it a formal part of our recruiting kits? Let me have your input. Thanks!" Kneeland responded on May 21, 2003, by stating that he was "still working to fine tune this piece" and that Kneeland would respond further to Randy Bratton's inquiry soon.

### F. Kirby's Remarks

On August 26, 2003, and August 27, 2003, WRL held a meeting in Cedar Rapids with the Brattons and agents who had been recruited by the Brattons to sell WRL fixed life products. The Brattons claim that, during the meeting, Kirby told the group of agents:

> This is the last life insurance company that you will ever
> need . . . . We like to have one marketing organization lead
> each of our distribution channels. We have the iGroup for
> Life Investors, Life Professionals for Peoples Benefit and we
> are pleased to have [the Brattons] for [WRL]. We only do

> business with people we believe in. We went to Memphis to meet with [the Brattons] and we were impressed with their operation.

During lunch on August 27, 2003, the Brattons claim that Kirby made the following statement: "You guys are doing fine. It will take several years to build this distribution. It took Larry Earl and the iGroup at least three years before they had significant, consistent production for Life Investors."

As President and chief executive officer of WRL, Kirby understood that he did not have the authority to enter into an oral marketing contract for five years, for an indefinite period or for life. He only had the authority to appoint Gary Bratton and Randy Bratton as agents pursuant to appointment agreements. In Kirby's communications with the Brattons, he never intended to commit WRL to a long-term relationship with the Brattons. When Kirby told the Brattons in the November 12, 2002 letter that "WRL was impressed with the quality of people we met and their enthusiasm for creating this new partnership[,]" he did not intend to create a lifetime contract with the Brattons to market WRL fixed life products.

Based upon discussions the Brattons had with Kirby, the Brattons believed five years would be an "accounting period" or "benchmark" for evaluating their performance in marketing WRL fixed life products.

### G. The Commission Schedule

The Brattons had discussions with WRL's Commissions Manager, Pat Melchert,[5] regarding the commission schedule by which the Brattons and agents recruited by the

---

[5] Melchert served as a supervisor in charge of commissions for WRL from approximately 1998 through 2004, and has been Manager of Commissions for WRL since 2004.

Brattons were to be paid for selling WRL products ("Commission Schedule").  During all relevant times, Melchert oversaw all matters pertaining to agent commissions for WRL. Melchert performed the same job for the following AEGON affiliates:  Life Investors, Peoples Benefit and Transamerica.  Melchert negotiated the commission structures for iGroup on Life Investors fixed life products and for Life Professionals on Peoples Benefit fixed life products in the same way that he worked with Randy Bratton to establish the Brattons' commission structure for WRL fixed life products.[6]  The Commission Schedule was finalized by the Brattons and Melchert in mid-2003 and memorialized in writing.  The Commission Schedule lists only WRL fixed life products.  Melchert only discussed with IMOs the commission structure for WRL fixed life products.  He did not discuss it with persons who would be merely selling WRL fixed life products.  In addition to the IMOs, only one entity that functioned like a general agent participated in the structuring of commission levels for WRL, Life Investors or Peoples Benefit products.

The Brattons received commission payments pursuant to the Commission Schedule. They were to be compensated for their efforts in marketing WRL fixed life products through payment of commissions on the sale of those products.  The Brattons' commissions on the sale of WRL fixed life products consisted of the difference between the commission level of the selling agent and the Brattons' "top level" of 135%. According to the Brattons' 2003 and 2004 tax documents, WRL paid the Brattons a total of $86,384.69 in "non-employee compensation."

---

[6]  The Brattons have never seen a written contract between WRL or other AEGON affiliates and the iGroup or Life Professionals, but the Brattons base their understanding of the relationship between these parties on their knowledge of the insurance industry and their own perceptions.

### H. Additional Communications Regarding the Brattons' Work

The Brattons expended time and resources recruiting agents and marketing WRL fixed life products in 2003 and 2004. They identified agents and agencies to recruit, traveled to meet with such agents and agencies, sent direct mailing to such agents and agencies and advertised elsewhere. For example, the Brattons placed a two-page advertisement introducing WRL fixed life products in the October/November 2003 issue of the magazine *Insurance Marketing*. Between November 2002 and March 18, 2004, the Brattons incurred expenses of $420,169 marketing WRL fixed life products. Advertisements placed by the Brattons for WRL fixed life products included the WRL name and logo. WRL required IMOs to obtain its approval of marketing materials before publishing them and distributing them. The Brattons regularly made reports to WRL regarding their efforts to market WRL fixed life products and recruit agents and agencies to sell the products. By March 2004, the Brattons had recruited between 150 and 200 agents to sell WRL fixed life products and those agents had generated approximately $500,000 in premiums on WRL fixed life products.

On September 8, 2003, and September 9, 2003, Kneeland and Gary Bratton exchanged emails, and Randy Bratton and Miller were copied on the emails. Kneeland inquired about how the Brattons' "recruiting" and "production" was progressing. In response, Gary Bratton informed Kneeland that the Brattons were building momentum and were still on target to achieve $3 million to $5 million in production for the first full year. Gary Bratton indicated that the Brattons were focusing on quality and were still "focused on the goals outlined in [the Brattons'] original business plan . . . ."

On September 26, 2003, Gary Bratton and Miller exchanged emails regarding Charles Roberts. Gary Bratton first wrote Miller:

> Randy [Bratton] told me of his conversation with you
> regarding contracting Charles Roberts with another Aegon
> [sic] company. . . . We could most likely agree to Charles
> contracting with Life Investors or Peoples Benefit, if he would
> agree to some minor terms with us, e.g. not sharing
> proprietary information about our organization, etc.
>
> But we would not be agreeable to Charles having a contract
> with [WRL] outside Bratton/IMG. This would be a total
> conflict of interest in that Charles has complete knowledge of
> our business model with respect to WRL, targeted agencies,
> etc. . . . To grant Charles a contract with WRL outside our
> organization would undermine our efforts. I am certain that
> you understand our position on this. Please call with any
> questions. Thanks again for all your support. Have a great
> weekend, Gary.

A few hours later, Kneeland responded to Gary Bratton and Miller and carbon copied Randy Bratton, writing: "I do not like the fact that we would contract with an outside company period . . . ! Seems to me like an end run is being tried and that is not how we are used to doing business."

Another email exchange took place on November 21, 2003. Gary Bratton wrote to Kneeland and Miller and copied Kirby and Randy Bratton regarding a recruiting problem involving a "prize recruit." Jesse Dunagan and Fred Johnson operated the Bayfront Financial IMO for WRL. In the email, Gary Bratton expressed concern that the Brattons' prize recruit had been assigned to Jesse Dunagan instead of the Brattons after the Brattons had recruited him. Gary Bratton wrote, in part:

> Fellas, we're spending a lot of money promoting WRL.
> Please recognize our efforts and work with us to avoid these
> kinds of problems in the future. I'm asking Randy to forward
> you a list of a thousand or more agents/agencies that we're
> actively recruiting; we would appreciate your passing this

along to the appropriate people and giving us the protection we
deserve.

Kneeland responded, asking Melchert: "Pat, is [sic] there some steps that an [sic] be taken to prevent this type of thing from happening going forward? Thanks."

## I. *The Termination*

On March 17, 2004, at about 8:30 a.m., Jesse Dunagan of the Bayfront Financial IMO contacted Randy Bratton via telephone. Dunagan told Randy Bratton that Miller had contacted Dunagan and informed Dunagan that his WRL contract would be terminated without reason. Dunagan warned Randy Bratton that the latter would be receiving a similar call.

Randy Bratton decided to use a tape recorder to make an audiotape of the expected call. The Brattons received a telephone call that day from Miller and Seger, regarding the termination of Gary Bratton's Appointment Agreement and Randy Bratton's Appointment Agreement (hereinafter collectively referred to as "Appointment Agreements"). Randy Bratton recorded the entire conversation, but the Brattons did not inform Miller and Seger that they were recording it. During the telephone conversation, Miller stated: "[T]his is, actually a relationship that we are going to be ending . . . ." At no time during the telephone conversation did the Brattons refer to their relationship with WRL by using the words "oral indefinite contract," "five year period," or "long-term relationship." During the conversation, Gary Bratton stated:

> Well, I know what an insurance contract says. Every one of
> them says the same thing: You can terminate an insurance
> agent with or without cause. But, um, I also know about
> ethics and morality. And um, I am sure that legally you can
> cancel our contracts, but um, its damn sure unethical and
> immoral cause, you know, considering the money we spent
> with your foreknowledge and with your encouragement.

18

> We've spent thousands and thousands of dollars and
> we've . . . brought awareness to every major agency in this
> country as far as the WRL fixed [life] products.

During the call and in response to Miller's statement that "the letter is coming," Randy
Bratton stated:

> But, [Miller], that's uh, that's fine contractually, and
> technically but get real, man, I mean, I understand you are
> giving us a heads up, you know, but you just pick up the
> phone and call somebody and tell them a year's worth of work
> is down the drain and have a nice day. I mean that is silly,
> you know?

During the telephone conversation, Randy Bratton also stated the following:

> What kind of criteria are you using to evaluate it on? Because,
> you are talking about what basically boils down to, in reality,
> nine months of, before we actually had product kits that we
> could mail to the agents. We got a half million in production
> and 150 agents. Its not setting the world on fire, but uh, that's
> real dollars, and that is our ass out in the public eye,
> representing you, and uh, you know the fact that you are
> pulling the plug after nine months makes us look like a fool.

On March 18, 2004, Miller wrote "Notice of Termination" letters to the Brattons
confirming the March 17, 2004 telephone conversation. In the letters, Miller wrote:

> As we discussed via telephone on March 17, 2004, we have
> decided to exercise our rights under Section 6 of your
> Appointment Agreement with [WRL] and terminate that
> agreement and all other agreements you may have with WRL.

> Therefore, please consider this to be your written notice of
> termination of those Agreements, which termination will be
> effective thirty days from the date of this letter.

## *V. SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate only when the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).  An issue of fact is "genuine" if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods*, 409 F.3d at 990 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it is a fact "'that might affect the outcome of the suit under the governing law . . . .'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).  In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus.*, 475 U.S. at 587-88.  Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts.  *Id*. at 587.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## VI. SUMMARY JUDGMENT ANALYSIS[7]

### A. Piercing the Corporate Veil

The Brattons argue that AEGON is not entitled to summary judgment on any of their counterclaims, because the corporate veil should be pierced to hold AEGON liable for the actions of WRL. WRL and AEGON argue that, because there are no exceptional circumstances here, the general rule which requires a subsidiary corporation to be treated as a separate entity from the parent corporation should prevail.

In order to pierce the corporate veil and hold AEGON liable for any of the alleged actions by WRL employees, the Brattons must show exceptional circumstances exist. "A court may disregard a corporate structure by piercing the corporate veil only under circumstances where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000) (quotation omitted). The burden is on the Brattons to show the existence of exceptional circumstances. *Id.* The court should consider six factors to determine whether such exceptional circumstances exist:

> (1) the corporation is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham.

---

[7] The parties do not dispute that Iowa law should be applied to each of the claims. WRL argues that Iowa law should apply because there is a choice of law provision in the Appointment Agreements. The Brattons argue that Iowa law should apply pursuant to the most significant relationship test. Because the parties agree that Iowa law should apply, the court deems it appropriate to apply Iowa law.

*Id.* (citing *C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 597 (Iowa 1987)).

Viewing the evidence in the light most favorable to the Brattons, the court finds that there is no evidence supporting their claim that AEGON is liable for the actions of WRL. The Brattons have not raised a genuine issue of material fact that any of the six factors in the exceptional circumstances test are present. Although there is undisputed evidence that AEGON owns WRL and Life Investors and that these two AEGON statutory carriers share office space in Cedar Rapids; that AEGON's statutory carrier companies include WRL, Life Investors, Transamerica, and Peoples Benefit and that employees of each of these statutory carrier companies work together to sell AEGON insurance products; and that the administrative, actuarial and legal activities of WRL, Life Investors, Peoples Benefit, Transamerica and Monumental have been consolidated under the name "AEGON Financial Partners," such evidence does not meet any of the six factors of the exceptional circumstances test. As such, AEGON is entitled to judgment as a matter of law on each of the Brattons' counterclaims.

### B. The Brattons' Breach of Contract Claims

WRL argues that it is entitled to summary judgment on the Brattons' breach of contract counterclaim because the Appointment Agreements contain merger or integration clauses which replace any agreements that were entered into prior to the dates the Appointment Agreements were signed. The Brattons argue that the Appointment Agreements are not integrated written contracts and that they do not cover all aspects of the Brattons' business relationship with WRL. The Brattons further argue that the Appointment Agreements contain only "ambiguous or ineffective integration clauses" and that they do not "encompass the subject matter underlying the Brattons' contract and quasi-contract claims."

### 1. Whether the Appointment Agreements are fully-integrated agreements

"[W]hen an oral agreement precedes a written agreement on the topic, ordinarily it will be found the oral discussion merged into the written agreement." *Commercial Trust & Sav. Bank v. Toy Nat'l Bank*, 373 N.W.2d 521, 523 (Iowa Ct. App. 1985). The "key question," however, is the intent of the parties. *See id.*; *id.* ("There must be an indication of intent that the second agreement replaces the first."). "[T]he subsequent written agreement is the final expression when 'the terms thereof are inconsistent with the earlier agreement *and intended to be substituted for it . . .'.*" *Id.* (adding emphasis and quoting *S. Tex. Land Co. v. Sorensen*, 202 N.W. 552, 553 (Iowa 1925)). "An agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement." *Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996). "Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence." *Id.* (citing Restatement (Second) of Contracts § 209, cmt. c (1981)). Even when the written agreement lacks ambiguity on its face, "extrinsic evidence is admissible to show whether or not [the] writing is an integrated agreement." *In re Eickman's Estate*, 291 N.W.2d 308, 312 (Iowa 1980).

### a. Gary Bratton's Appointment Agreement

The court finds that Gary Bratton's Appointment Agreement is not an integrated document, because it is not the complete expression of the agreements between WRL and Gary Bratton. *See Whalen*, 545 N.W.2d at 290. Gary Bratton's Appointment Agreement, in pertinent part, provides: "This Appointment Agreement is between the natural person or business entity that signs below . . . and the Member of the AEGON Insurance Group . . . that signs a schedule to this Appointment Agreement . . . ." Gary Bratton's Appointment Agreement contains several other references to a schedule, including the following statement in paragraph 7: "This Appointment Agreement will take effect when

the Company signs a Schedule at the Company's home office and appoints you as its insurance agent according to applicable law."

Gary Bratton received his agent number from WRL in a letter dated July 10, 2003. However, he never received a schedule. By its terms, the Appointment Agreement consists of the two-page Appointment Agreement and a schedule. Neither party has presented evidence of a schedule, as required by paragraph 7 and other provisions of Gary Bratton's Appointment Agreement. The court concludes that Gary Bratton's Appointment Agreement never became effective and, therefore, is not an integrated document. Any oral agreement which preceded Gary Bratton's Appointment Agreement is not merged into the subsequent written agreement.

### b.      *Randy Bratton's Appointment Agreement*

Randy Bratton's Appointment Agreement contains the following provision: "This Agreement and its Schedule form the entire agreement between the Company and yourself. This Agreement terminates and replaces any prior agreement between the Company and yourself." Randy Bratton signed the agreement on November 1, 2002. Unlike the deficiency in Gary Bratton's Appointment Agreement, Randy Bratton and WRL also signed a schedule for fixed annuity contracts on November 1, 2002, and Randy Bratton received an additional schedule signed by a WRL representative on March 20, 2003. Therefore, the court finds that Randy Bratton's Appointment Agreement is a fully-integrated document.

When the court finds a written agreement to be fully integrated, "the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement." *Whalen*, 545 N.W.2d at 290 (citing Restatement (Second) of Contracts § 213 (1981)). The parol evidence rule bars the introduction of extrinsic evidence of *prior* and *contemporaneous* negotiations, not evidence of subsequent

negotiations, to show modification of a written contract. *Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005). Moreover, it applies where a "'handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the . . . agreement.'" *Whalen*, 545 N.W.2d at 291 (quoting *Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 476 (Iowa 1981)). Therefore, the court may not consider extrinsic evidence which contradicts the terms of Randy Bratton's Appointment Agreement; extrinsic evidence of negotiations that took place prior to November 1, 2002, or that occurred contemporaneously, may not be considered. *See Commercial Trust*, 373 N.W.2d at 523.

### 2. *The oral contract*

#### a. *The statute of frauds*

In the Brattons' counterclaims, they allege that the Appointment Agreements were orally modified or that they had an independent oral agreement to market WRL fixed life products for at least five years and to be WRL's exclusive national distributor. WRL argues such evidence is inadmissible under the Iowa Statute of Frauds.

The Iowa Statute of Frauds "is a rule of evidence and not of substantive law." *Harriott v. Tronvold*, 671 N.W.2d 417, 422 (Iowa 2003). It "renders incompetent oral proof of [certain] promises." *Id.* "The statute [of frauds] exists for the prevention of fraud and perjury; and the means that it adopts is to refuse enforcement unless the contract is evidenced by a signed document." *Peterson v. Petersen*, 355 N.W.2d 26, 28 (Iowa 1984).

In pertinent part, the Iowa Statute of Frauds provides:

> [N]o evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party

> charged or by the party's authorized agent: . . . 4. Those that are not to be performed within one year from the making thereof.

Iowa Code § 622.32(4). In discussing this section, the Iowa Supreme Court has explained:

> In deciding whether a particular oral contract is governed by section 622.32(4), the question is not whether performance must actually be completed within a year but whether it would be *possible* to perform the contract within that time frame. Put another way, contracts of uncertain duration are simply excluded; the provision covers only those contracts whose performance cannot possibly be completed within a year. . . . Section 622.32(4) is narrowly applied to contracts that are not capable under any circumstances of being performed in one year.

*Harriott*, 671 N.W.2d at 423 (emphasis in original) (citations, quotations and internal alterations omitted); *see also Smidt*, 695 N.W.2d at 22 ("The question engendered by the statute of frauds is solely one of capability of performance . . . .").

Examining the undisputed facts in the light most favorable to the Brattons, the court concludes that, if an oral contract existed, it was a conditional agreement that was capable of performance within one year. In Gary Bratton's January 27, 2003 email to Kneeland, Gary Bratton stated: "*As long as we're doing a good job for you*, I would hope that you would not contract agents directly to the company and that you would refer agent inquiries to us." (emphasis added). In his deposition, Gary Bratton testified as follows:

> Nobody ever said that it was a no-cut contract, but, again, if both parties are performing and we're people of integrity and we're doing what we're supposed to and the company is doing what they're supposed to, supplying products, then we would anticipate or certainly, I, as an intelligent person, would anticipate the contract would go on indefinitely.

This evidence reflects an understanding that the alleged oral contract would continue "as long as" and "if" the Brattons performed satisfactorily. Either one of those conditions could have ceased within one year. Moreover, the alleged oral contract was capable of performance within one year, because WRL could have decided to stop providing fixed life products or it could have gone out of business. *Cf. Shearon v. Boise Cascade Corp.*, 478 F.2d 1111, 1115 (8th Cir. 1973) (applying Iowa law and concluding that, even though the oral contract was "of no specified duration," the parties could have completed performance within one year because "one or both parties might have gone out of business within a year"); *Smidt*, 695 N.W.2d at 22 (determining that the Iowa Statute of Frauds was not applicable because the employer *could have* promoted the employee within one year). Therefore, the statute of frauds does not prohibit the introduction of evidence of the alleged oral contract.

### b. Elements of breach of contract

WRL seeks summary judgment on the Brattons' contract claim.

> The complaining party in a breach of contract action must prove the following elements: "(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach."

*Wagner Enters., Inc. v. John Deere Shared Servs., Inc.*, 397 F. Supp. 2d 1097, 1104-05 (N.D. Iowa 2005) (quoting *Med. Assocs. Health Plan, Inc. v. CIGNA Corp.*, 393 F. Supp. 2d 722, 725-26 (N.D. Iowa 2005)). "'Whether an oral contract existed, what its terms were, and whether it was breached ordinarily are questions for the trier of fact.'" *Id.* at 1105 (quoting *Dallenbach v. MAPCO Gas Prods., Inc.*, 459 N.W.2d 483, 486 (Iowa 1990)). To survive summary judgment, however, the Brattons must be able to present

sufficient evidence of the alleged oral contract and its terms to ascertain what duties and conditions were established by the oral contract. *See id.*; *see also Celotex Corp.*, 477 U.S. at 323 (explaining that, when the party with the burden of proof fails to make a sufficient showing of an essential element of a claim, the opposing party is "entitled to a judgment as a matter of law").

"To prove the existence of an oral contract, the terms must be sufficiently definite for a court to determine with certainty the duties of each party, the conditions relative to performance, and a reasonably certain basis for a remedy." *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998). "[W]hen the terms are not definite, courts are reluctant to impose reasonable terms on contracting parties." *Id.* However, the agreement must only be certain (not absolutely certain) and unequivocal in its essential terms. *In re Price*, 571 N.W.2d 214, 216 (Iowa Ct. App. 1997). For an "oral contract to be found and enforceable, the terms must be so definitely fixed so that nothing remained except to reduce the terms to writing." *Id.* However, when an oral contract appears to exist, Iowa courts are "reluctant to find it too uncertain to be enforceable." *Gallagher*, 587 N.W.2d at 617.

The Brattons claim that the oral agreement permitted them to market WRL fixed life products and recruit insurance agents and agencies to sell those products. The Brattons claim that WRL was bound by the following terms and conditions: (1) WRL agreed to pay the Brattons 135% commission when the recruited agents sold WRL products; (2) WRL agreed to allow the Brattons a "reasonable amount of time" to build the distributorship; and (3) WRL agreed to refrain from paying any other IMO at the same commission level. WRL argues that the terms of the alleged oral contract are not certain enough to be enforceable.

WRL focuses on statements made by Kirby and argues that the Brattons cannot prove element one—that a contract existed. For purposes of the Motion, WRL concedes that Kirby made the statements the Brattons attribute to him. That is, he stated the following:

(1)     "[W]e hope this will be the last company that you will ever need."

(2)     "[T]his is the last life insurance you will ever need."

(3)     "[W]e like to have one marketing organization lead each of our distribution channels. We have the iGroup for Life Investors, Life Professionals for Peoples Benefit and we are pleased to have [the Brattons] for [WRL]. We only do business with people we believe in. We went to Memphis to meet with [the Brattons] and we were impressed with their operation."

(4)     "[Y]ou guys are doing fine. It will take several years to build this distribution. It took Larry Earl and the iGroup at least three years before they had significant, consistent production for Life Investors."

WRL claims that these statements are too indefinite to form an oral contract. The court agrees that these statements, standing alone, are too indefinite to form a contract and are mere oral assurances by WRL. *See Wagner*, 397 F. Supp. 2d at 1106 (finding that the statement "I will tell you that unless you just totally screw up [the contract] won't be canceled" was merely an oral assurance regarding the contract and did nothing to amend the contract terms).

The above-stated assurances by Kirby, however, are only one piece of the alleged implied contract. As the Brattons correctly point out, the evidence shows that the parties' relationship consisted of "a series of meetings, discussions, and proposals that occurred

between November 7, 2002 and January 2003." The parties met in WRL's Florida offices in November 2002, then the Brattons sent the Proposal to Kirby in December 2002 and Kirby met with the Brattons at their Tennessee office in January 2003 to discuss the Proposal. The Brattons formally presented the Proposal at that January 2003 Meeting. The Proposal contemplated, in part, that the Brattons would "control and manage virtually all marketing functions for the [WRL] fixed life products division" in exchange for "a total payout of about 140% in first year commission." Moreover, at the January 2003 Meeting, the Brattons presented a slide presentation which included projections for a "fixed life premium volume of $50,000,000 within five years." Within the context of the slide presentation, the Brattons requested that WRL provide them with adequate commission payout, a marketing expense allowance, home office support and "[p]rotection, based on Performance—No New Agents Contracted directly to WRL."

Following the formal presentation of the Proposal, Miller made the Rodeo Remark and Gary Bratton and Kneeland subsequently exchanged emails. Gary Bratton stated, in pertinent part: "We're delighted to be heading up the fixed products distribution for WRL . . ." Kneeland replied, in part: "We are also looking forward to having [the Brattons] marketing the WRL 'fixed' products. 'Heading up the distribution for WRL' might be a little strong." In turn, Gary Bratton replied:

> My comment about our heading up the WRL fixed life distribution was meant to say that with the exception of your existing Aegon [sic] distribution, you would afford us the same consideration as you do the iGroup. As long as we're doing a good job for you, I would hope that you would not contract agents directly to the company and that you would refer agent inquiries to us. Also, as I mentioned in our presentation and conversation in Memphis[,] if you decide to contract any other group at our contract level, I would hope that you would give

> us some advance notice.  If these are not your intentions,
> please let us know.

No one from WRL ever responded to this email until Miller and Kneeland sent a letter to the Brattons on May 7, 2003, and stated, in part, that "we do not give exclusives."  In a May 19, 2003 letter the Brattons replied: "We understand that we do not have an exclusive to market WRL fixed products . . . ."  On the same day, Randy Bratton emailed Kneeland and Miller and discussed the information to be supplied in the Brattons' "recruiting kits."

Following the January 2003 Meeting, the Brattons began marketing WRL fixed life products and began recruiting agents and agencies to sell the products.  WRL paid the Brattons for their efforts beginning in mid-2003 pursuant to the Commission Schedule created by Randy Bratton and Melchert.  As late as September 2003, and in response to Gary Bratton's concern regarding Roberts working for another one of AEGON's statutory carrier companies, Kneeland made the statement to Gary Bratton that he did not like the idea of WRL contracting with Charles Roberts with a company other than the Brattons.

The Iowa Supreme Court has determined that "'[w]here an offeree fails to reply to an offer, his silence and inaction operate as an acceptance . . . [only in several situations, including w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.'"  *Roger's Backhoe Serv. v. Nichols*, 681 N.W.2d 647, 651 (Iowa 2004) (quoting Restatement (Second) of Contracts § 69, cmt. a (1981)).  Here, the Brattons have presented sufficient facts for a jury to find that they had made an offer and WRL accepted the offer through a combination of their silence and knowledge that the Brattons were expending resources and using their best efforts to promote WRL fixed life products.  In other words, they have presented sufficient facts for a jury to find that an implied-in-fact contract existed and that the terms and conditions of the contract were as set forth above.

The facts are sufficient for a jury to find that the parties entered into an implied five-year or indefinite contract.

The Brattons can show that a contract existed and that the terms are sufficiently definite to be enforceable. Furthermore, the Brattons can establish the remaining breach of contract elements. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224-25 (Iowa 1998) (noting that breach of contract in Iowa requires the existence of a contract, sufficiently definite terms and conditions, performance, breach and damages). The Brattons can show that they performed under the terms of the contract. Specifically, they marketed and promoted WRL fixed life products and recruited agents and agencies to sell the products. The Brattons have also presented evidence to establish element four of the breach of contract claim, that is, evidence in the record shows that WRL terminated the relationship on March 17, 2004, regardless of whether the relationship was a five-year or indefinite relationship. Finally, the Brattons have presented evidence to show that they incurred damages as a result of the action taken by WRL in March of 2004. A jury could find that, as a result of the Brattons' promotion of WRL fixed life products and their efforts to recruit others to sell WRL fixed life products, the Brattons incurred expenses of $420,169.

Similarly, it is for the fact-finder to determine whether the alleged oral contract is certain enough to be enforceable. *See Gallagher*, 587 N.W.2d at 617. The court finds that, as a matter of law, the Brattons have presented sufficient evidence to prevail on their breach of contract claim.

### c. *Whether the oral contract is terminable at will*

Next, WRL claims that, even if the Brattons can establish the elements of a breach of contract claim, summary judgment should be entered against them because contracts with indefinite terms are terminable at will. The Brattons respond that the oral contract

was not terminable at will and that WRL's reliance on cases involving employment and personal services contracts is misplaced.

The cases WRL cites in support of its proposition that contracts with indefinite terms are terminable at will are all employment and personal services contract cases. *See, e.g., Olander v. State Farm Mut. Automobile Ins. Co.*, 317 F.3d 807, 810 (8th Cir. 2003) (stating that "the general rule in this country has long been that a personal services contract of indefinite duration may be terminated at will by either party"). The court finds that, if an oral contract existed, it is not a personal services contract and, thus, the cases cited by WRL are inapplicable. A personal services contract generally "contemplates performance of duties involving the exercise of special knowledge, judgment, taste, skill, or ability." *Corell v. Teamsters Local Union No. 828*, No. 00-1098, 2002 WL 31018534, at *2 (Iowa Ct. App. Sept. 11, 2002) (unpublished). Such contracts historically have included contracts to paint a picture, contracts between an author and his publisher, contracts in which one party agrees to sing, and agreements to render services as a physician. *Id.* (citing *In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986)). The alleged agreement which would authorize the Brattons to market, distribute and recruit for WRL is distinct from a personal services or employment contract.

The court also finds that the distributorship case cited by the Brattons is distinguishable from the facts at hand. In *C.C. Hauff Hardware, Inc. v. Long Mfg. Co.*, 136 N.W.2d 276 (Iowa 1965), the hardware company was an *exclusive* distributor of hardware. *Id.* at 278-79. As part of this agreement, the hardware company agreed to carry certain stock. *Id.* The Iowa Supreme Court held that reasonable notice was required to terminate the exclusive distributorship agreement. *Id.*; *see also Des Moines Blue Ribbon Distribs. v. Drewrys Ltd., USA, Inc.*, 129 N.W.2d 731, 736 (Iowa 1964) (holding that reasonable notice is required for contract termination where a partially oral contract

gives a distributor a *sole* distributorship for an indefinite period of time and where the beer distributor advertised and promoted the brewery's product). In the instant case, the Brattons did not maintain stock. Furthermore, the evidence shows that this was not an exclusive agreement. In fact, in the May 19, 2003 letter, Gary Bratton admits that the Brattons do not have an exclusive agreement to market WRL fixed life products.

When the parties to a contract fail to specify the duration of the contract, Iowa courts look to the type of contract at issue. "When the duration of employment contracts is indefinite, the contract can be terminated at will by either party." *Keppy v. Lilenthal*, 524 N.W.2d 436, 439 (Iowa Ct. App. 1994) (citing *Blackhawk Bldg. Sys. v. Law Firm*, 428 N.W.2d 288 (Iowa 1988)). When a contract grants an exclusive distributorship of goods and the contract is for an indefinite duration, the contract "continue[s] for a reasonable time and [can] be terminated without cause only upon reasonable notice." *Id.* (citing *Des Moines Blue Ribbon Distribs.*, 129 N.W.2d at 731). Where the contract does not fit neatly into a category, the Iowa courts examine several factors. The Iowa Supreme Court has explained:

> "If a period of duration can be fairly implied from the nature of the contract, its subject matter and relationship of the parties, the contract is not terminable at the pleasure of either party and the court will give effect to the manifest intent of the parties. It also has been held that a contract will be held terminable within a reasonable time or revocable at will, depending on the circumstances, where no termination date was within the contemplation of the parties, or where their intention in regard thereto could not be ascertained."

*Id.* (citing 17A C.J.S. *Contracts* § 398, at 480 (1963)); *see id.* (finding an implied three-year term in an oral contract between a feeder pig farm operator and feeder pig lessors, and determining that the contract was not terminable at will where the operator of

the feeder pig operation had made it known to the feeder pig lessors that the operator had intended to have her own farrowing operation within three years and where the lessors had entered into the agreement in order to revitalize their herd and earn money).

Because reasonable notice is required to cancel some oral contracts and the Brattons have shown that WRL abruptly terminated their contracts, it is for the jury to determine whether notice was required in this case and whether the notice provided by WRL was reasonable. The court declines to grant summary judgment in favor of WRL based upon its argument that this alleged implied contract was terminable at will.

### C. The Brattons' Promissory Estoppel Claim

WRL seeks summary judgment on the Brattons' promissory estoppel claim, arguing the following: (1) promissory estoppel is inapplicable because the Appointment Agreements are express written contracts and (2) the Brattons have not presented evidence adequate to establish the four elements of promissory estoppel. The Brattons argue that they have presented evidence to prove their promissory estoppel claim. In the Second Amended Complaint, they allege WRL made the following promises: (1) that the Brattons would be treated the same as iGroup and Life Professionals, (2) that the Brattons would be given sufficient time to market and recruit agents and agencies to sell WRL fixed life products in the open market, (3) that the Brattons would have an exclusive right to market or recruit agents and agencies to sell the products during a five-year period of time and (4) that WRL would direct all inquiries it received from agents or agencies related to the sale of WRL fixed life products to the Brattons during the five-year period.

Promissory estoppel is based on the theory that parties should be made liable for their promises even though no consideration existed, a requirement under contract law. *Kolkman v. Roth*, 656 N.W.2d 148, 152 (Iowa 2003). To prove promissory estoppel, the Brattons must show:

35

> (1) a clear and definite promise; (2) the promise was made with the promissor's clear understanding that the promisee was seeking assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his or her substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Id.* at 155; *see also Nat'l Bank of Waterloo v. Moeller*, 434 N.W.2d 887, 889 (Iowa 1989) (noting that the burden of proof to establish estoppel is on the plaintiff). Iowa law requires strict proof of each of these four elements. *Kokman*, 656 N.W.2d at 155. "Clearly, much more than mere nonperformance of a promise must be shown to obtain the benefits of promissory estoppel." *Id.* The Iowa Supreme Court has noted that, "in applying this doctrine [of promissory estoppel,] each case must be decided in the light of its surrounding facts and circumstances. There can be no hard and fixed rule for determining when it is appropriate." *Johnson v. Pattison*, 185 N.W.2d 790, 795 (Iowa 1971).

### 1. *Whether Randy Bratton's Appointment Agreement preempts a claim of promissory estoppel*

WRL first argues that "[p]romissory estoppel cannot form the basis of a claim if it represents the same performance contemplated under a written contract." The Brattons respond that "the rule that a party may not assert a cause of action for promissory estoppel when an express contract encompasses the same subject matter does not apply here because the Appointment Agreements do not pertain to the same subject matter as the Brattons' promissory estoppel claim."

Here, the terms of Randy Bratton's Appointment Agreement do not encompass the entirety of the alleged oral agreement. Randy Bratton's schedules pertain only to annuity products and the topic of the alleged oral agreement is WRL fixed life products. The court has found that Gary Bratton's Appointment Agreement never became effective. Therefore,

the court concludes that the Brattons' promissory estoppel claim is not barred by the fact that there is also one valid written appointment agreement between the parties.

**2.      *Whether the Brattons can establish a claim of promissory estoppel***

WRL's second argument is that the Brattons cannot establish the four elements of promissory estoppel based upon the undisputed material facts.

The Iowa Supreme Court has examined the phrase "clear and definite promise":

> A "promise" is "a declaration . . . to do or forbear a certain specific act." *Black's Law Dictionary* 1213 (6th ed. 1990). A promise is "clear" when it is easily understood and is not ambiguous. *See Webster's Third New International Dictionary* 419 (unab. ed. 1993). A promise is "definite" when the assertion is explicit and without any doubt or tentativeness. *See id.* at 592.

*Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 50-51 (Iowa 1999). The Iowa Supreme Court has emphasized "clarity" and "inducement" with regard to prong one. *See Nat'l Bank of Waterloo*, 434 N.W.2d at 889 (summarizing Iowa cases and noting that "[t]his dual emphasis on clarity and inducement parallels the Restatement (Second) [of Contracts'] definition of an agreement for purposes of promissory estoppel as '[a] promise which the promisor should reasonably expect to induce action . . . on the part of the promisee"). Moreover, a representation, as opposed to a promise, is "'a statement . . . made to convey a particular view or impression of something with the intention of influencing opinion or action.'" *Schoff*, 604 N.W.2d at 51 (citing *Webster's Third New International Dictionary* 1926 (unab. ed. 1993)).

There are a series of alleged statements here upon which the Brattons contend they relied. Kirby made oral statements pertaining to the Brattons' marketing of WRL fixed life products on November 7, 2002 and August 26 and 27, 2003. Such oral statements came in the context of negotiations involving written correspondence in the form of letters

and emails, slide presentations, telephonic conferences and individual telephone conversations in which the parties discussed the details of the Brattons' involvement in the sale of WRL fixed life products and its recruitment of agents and agencies to sell the products.

The court finds that reasonable jurors could find that WRL representatives made oral and written assurances to the Brattons that they would be WRL's main distributor of WRL fixed life products for several years. A reasonable jury could also conclude that, by spending money, time and resources to promote such products and to recruit agents and agencies to do the same, the Brattons relied on WRL's assurances. Moreover, the court finds substantial evidence indicates WRL representatives were aware of the Brattons' reliance on the oral assurances. For example, evidence of this knowledge is contained in the September 26, 2003, and the November 21, 2003, email exchanges. In those emails, Gary Bratton discussed the Brattons' "business model with respect to WRL" and writes to Kneeland that the Brattons are "spending a lot of money promoting WRL." The facts in the record permit a jury to find that the Brattons suffered a "substantial detriment" due to their reliance on WRL's representations. Examining the facts in the light most favorable to the Brattons, the court concludes that the Brattons have presented evidence sufficient to prove each element of a promissory estoppel claim. Therefore, summary judgment is not appropriate and the claim should be submitted to the jury. *See Budget Mktg., Inc. v. Centronics Corp.*, 927 F.2d 421, 426-28 (8th Cir. 1991) (applying Iowa law and concluding that the promissory estoppel claim survived summary judgment where the parties had taken "substantial" steps toward consummating the deal, including a non-binding letter of intent to merge; an affirmation by the defendant's chief executive officer that defendant was ready to move ahead with the closing; an oral confirmation of the closing date; a meeting which proceeded on the assumption that the merger deal would

close; and a statement by defendant that a certain SEC filing would have to be made after the closing).

### D.  The Brattons' Misrepresentation Claims

WRL claims that the representations WRL representatives made to the Brattons are not sufficient to support claims of negligent or fraudulent misrepresentation.[8] That is, WRL argues that no fraud or negligence occurred when it represented that the Brattons would be the primary national distributor of WRL fixed life products for an indefinite period of time and that the Brattons would be treated the same way as AEGON's other IMOs.  The Brattons argue that they are able to prove fraudulent misrepresentation because the "intent to deceive" is shown by the deposition testimony of Kirby and Miller.

### 1.  Negligent misrepresentation

As a threshold matter, the court notes that the Brattons failed to make any response in their Resistance in support of their negligent misrepresentation claim.  "When a motion for summary judgment is made and supported . . . [and] the adverse party does not . . . respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e); *see Gretillat v. Care Initiatives*, 414 F. Supp. 2d 901, 909 (N.D.

---

[8]  In their Second Amended Complaint (docket no. 83), the Brattons allege one count of Negligent Misrepresentation (*see* paragraphs 69-76) and one count of Actual Misrepresentation (*see* paragraphs 77-85).  WRL correctly notes that the Brattons' Negligent Misrepresentation Claim appears to allege fraudulent misrepresentation and their Actual Misrepresentation Claim appears to allege negligent misrepresentation.  Because the court finds that each claim is pled properly if the Second Amended Complaint document is viewed as a whole, *see* Fed. R. Civ. P. 8(a)(2) (providing that a complaint must include only a "short and plain statement of the claim showing that the pleader is entitled to relief") *and id.* at 9(b) (requiring "all averments of fraud" to be "stated with particularity" in the complaint), the court shall refer to paragraphs 69 to 76 as the Brattons' fraudulent misrepresentation claim and it shall refer to paragraphs 77 to 85 as the Brattons' negligent misrepresentation claim.

Iowa 2006) (granting summary judgment where the plaintiff failed to respond to defendant's arguments). The court must still, however, determine whether the entry of summary judgment is "appropriate." Fed. R. Civ. P. 56(e).

"The tort of negligent misrepresentation requires proof that the plaintiff justifiably relied on the representation made by the defendant." *Pollman v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 409-10 (Iowa 1997). The Iowa Supreme Court has stated:

> The elements for the tort of negligent misrepresentation are:
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered (a) by the person . . . for whose benefit and guidance he intends to supply the information . . . ; and (b) through reliance upon it in a transaction that he intends the information to influence . . . .

*Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994); *see also* Iowa Civil Jury Instructions 800.1 (providing the "essentials for recovery" in a negligent misrepresentation case). The tort of negligent misrepresentation "does not depend on the existence of a contractual relationship," *Barske*, 514 N.W.2d at 924, and it "does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant," *Sain v. Cedar Rapids Cmty. School Dist.*, 626 N.W.2d 115, 126 (Iowa 2001). Like all negligence actions, the Brattons must show WRL owed them a duty of care in order for their negligent misrepresentation claim to survive summary judgment. *See id.* at 124. "[T]his duty arises only when the information is

provided by persons in the business or profession of supplying information to others." *Id.*; *see also Molo Oil Co.*, 578 N.W.2d at 227 ("[A] person in the profession or business of supplying information or opinions owes a duty of reasonable care to clients and others."). The duty does not apply where a retailer is in the business of selling and servicing its goods, and, if the transaction at issue was an arm's length transaction, there is no duty of care. *Id.* In other words, providing false information is not enough to sustain a negligent misrepresentation claim. *See Meier v. Alfa-Laval, Inc.,* 454 N.W.2d 576, 581 (Iowa 1990) (providing that merely providing false information is not an actionable claim of negligent misrepresentation). Therefore, in order to survive summary judgment, the Brattons must show that they were involved in a special relationship with WRL. *See Sain*, 626 N.W.2d at 124-25 (explaining that a "special relationship" is an "important factor to support the imposition of a duty of care under a claim for negligence"). "Whether such a duty exists is always a question of law for the court." *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996) (citing *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 811 (Iowa 1994)).

Here, the Brattons' negligent misrepresentation claim cannot survive summary judgment. First, WRL is not in the business of providing information to others. The Iowa Supreme Court has noted that the tort of negligent misrepresentation "predominately applies to situations where the information supplied harmed the plaintiff in its relations with third parties, as opposed to harm to a plaintiff in its relations with the provider of the information." *Sain*, 626 N.W.2d at 126. Viewing the undisputed facts in the light most favorable to the Brattons, the court cannot find a "special relationship" or owed duty in this situation. *Compare Jensen v. Sattler*, 696 N.W.2d 582, 583-84 & 588 (Iowa 2005) (finding that no "special relationship" and concomitant duty of care where the plaintiff had purchased a home in an "arms-length and adversarial transaction" with defendant), *with Sain*, 626 N.W.2d at 118-19 & 125 (finding that a high school counselor who provided

41

information to a student regarding the kind and number of academic credits needed to compete in intercollegiate sports owed a duty of care to the student). This situation is more like an arms-length transaction than a situation where an attorney, accountant or counselor provides information to a person who then relies upon that information and is harmed in dealings with third parties. *See e.g.*, *Fry*, 554 N.W.2d at 265 (citing cases where Iowa courts found an accountant, an investment broker and a savings and loan company owed duties of care to their clients). Therefore, the court finds, as a matter of law, that WRL representatives owed no duty of care to the Brattons.

WRL's Motion shall be granted as to the Brattons' negligent misrepresentation counterclaim.

### 2.     *Fraudulent misrepresentation*

"The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury." *Smidt*, 695 N.W.2d at 22. Moreover, "[t]he mere breach of a promise is never enough in itself to establish the fraudulent intent." *Id.* (citing *Magnusson Agency v. Pub. Entity Nat'l Co.- Midwest*, 560 N.W.2d 20, 29 (Iowa 1997)). To establish a fraudulent misrepresentation claim, the Brattons must demonstrate their claim "by a preponderance of clear, satisfactory, and convincing evidence." *See Magnusson Agency*, 560 N.W.2d at 28. The Brattons must show that Kirby, Kneeland and Miller had an intent to deceive at the time they made their representations to the Brattons. *See Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004) (affirming grant of summary judgment on plaintiff's fraudulent misrepresentation claim and finding no evidence in the record that a university president intended to deceive the plaintiff-security guard at the time the president made the relevant representations because the president changed his mind due to a change in circumstances).

Viewing the facts in the light most favorable to the Brattons, the court finds that the fraudulent misrepresentation claim cannot be submitted to a jury. In order to survive summary judgment, the Brattons need to establish proof of each of the seven elements of the claim. *See generally Smidt*, 695 N.W.2d at 22-23 (affirming a grant of summary judgment on the fraudulent misrepresentation claim where the plaintiff could not prove the intent or reasonable reliance elements). They have failed to present evidence to establish at least three of the elements: falsity, scienter and intent.

The court finds that summary judgment is appropriate because the Brattons cannot establish the falsity element. "In order to prove the 'falsity' element of a fraud action, it is necessary to establish that the representation was false at the time it was relied upon." *Hagarty v. Dysart-Geneseo Cmty. School Dist.*, 282 N.W.2d 92, 95 (Iowa 1979). The Brattons have shown neither that Kirby's statements were false when he made them in August of 2003 nor that Miller or Kneeland's written statements were false. *See City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa 1996) ("A statement of intent to perform a future act is actionable only when spoken with the existing intention not to perform."). The Brattons have presented no evidence showing that the WRL representatives planned to terminate the Brattons' relationship at the time they made the statements regarding the Brattons' involvement in distributing WRL fixed life products and recruiting agents. There is no evidence that the WRL representatives did not intend to perform when they made the statements about the future relationship between WRL and the Brattons. The undisputed facts show that WRL performed for several months—paying the Brattons commissions and supporting the Brattons' efforts to market WRL fixed life products and to recruit agents and agencies to sell WRL fixed life products. As such, the Brattons' fraudulent misrepresentation claim fails on the falsity element.

The Brattons also cannot establish the scienter element.

> A plaintiff can establish scienter, or knowledge of the falsity of a material representation, by showing that the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth, falsely stated or implied that the representations were based on personal knowledge or investigation or had a special relationship with the plaintiff and therefore had a duty to disclose.

*McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995). Here, because the Brattons have not shown that the representations were false, they also cannot establish the scienter element, or knowledge of the falsity. *See id.*

Lastly, the Brattons have not established the intent element of fraudulent misrepresentation. WRL claims that Kirby had no intent to deceive when he made the statements, such as "we hope this will be the last company that you will ever need," and "[AEGON] likes to have one marketing organization for each of our distribution channels . . . [and] we are pleased to have [the Brattons] for [WRL]." The last of those statements was made on August 27, 2003. WRL terminated the Brattons in March of 2004. Therefore, over six months passed between the time Kirby made the last statement to the Brattons and the time Miller terminated them. The evidence shows that Kirby was no longer the chief executive officer of WRL in March of 2004. Moreover, the Brattons only recruited about 150 agents and achieved about $500,000 in production after projecting fixed life premiums of between $3 million and $5 million in the first year of production. The six-month time lag and attendant change in circumstances tends to show that WRL, at the most, broke a promise rather than intentionally deceived the Brattons. *See Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 566 (Iowa 1987) (noting that, although "[t]he mere breach of a promise is never enough in itself to establish the fraudulent intent[,]" such intent may be inferred when a promise is repudiated soon after it is made when there are no intervening change in circumstances). Here, the Brattons have presented

insufficient evidence to prove with clear, satisfactory and convincing evidence that Kirby and other WRL representatives already decided to terminate WRL's relationship with the Brattons when Kirby made the representations in August of 2003.

Because the Brattons cannot establish the falsity, scienter and intent elements of their fraudulent misrepresentation claim, the court shall grant summary judgment on this claim.

### E.  The Brattons' Quantum Meruit and Unjust Enrichment Claim

WRL correctly highlights the fact that the Brattons confuse the terms "quantum meruit" and "unjust enrichment" by failing to differentiate between them or separate them into two separate claims.  In *Iowa Waste Systems, Inc. v. Buchanan County*, 617 N.W.2d 23, 28-29 (Iowa 2000), the Iowa Supreme Court reviewed the history of each of these terms and explained how they are distinct.  Namely, quantum meruit claims are "grounded in the realm of pure contract" and unjust enrichment claims have been "placed in the equitable sphere of quasi contract." *Id.* at 29.  Further, "the antiquated term *quantum meruit* is actually used to denote a particular subclass of implied-in-fact contracts—an implied-in-fact contract to pay for services rendered." *Id.* (italics in original).  Therefore, quantum meruit claims are guided by contract principles and successful plaintiffs may recover "for the reasonable value of the services provided and the market value of the materials furnished." *Id.*  "Unjust enrichment on the other hand is not grounded in contract law but rather is a remedy of restitution." *Id.*  "Damages under a claim of unjust enrichment are limited to the value of what was inequitably retained. *Id.* at 30.

Initially, WRL argues that the Brattons' claims for quantum meruit and unjust enrichment fail because there is an express, written contract on the same subject matter, that is, the Appointment Agreements.  As discussed above, the court finds that the subject matter of the Appointment Agreements is distinct from the subject matter of the alleged

45

oral agreement in which the Brattons claim a right to a national distributorship for an indefinite period of time. Therefore, the court finds that judgment as a matter of law cannot be granted on the basis that there was a written contract covering the same subject matter at issue in the unjust enrichment and quantum meruit claims.

Moreover, the court rejects WRL's argument that the Brattons cannot use the unjust enrichment theory to circumvent the statute of frauds, because the court has found that the Iowa Statute of Frauds does not bar evidence of the alleged oral contract.

### 1. Unjust enrichment

To establish the elements of unjust enrichment, the Brattons must be able to show the following:

> (1) [the Brattons] conferred a benefit upon [WRL] to [the Brattons'] own detriment,
>
> (2) [WRL] had an appreciation of receiving the benefit,
>
> (3) [WRL] accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value, and
>
> (4) there is no at-law remedy that can appropriately address the claim.

*Id.* (citing *Irons v. Cmty. State Bank*, 461 N.W.2d 849, 855 (Iowa Ct. App. 1990)). The Brattons' unjust enrichment claim sets forth the allegations that the Brattons "expended time, money and resources advertising and marketing [WRL's] fixed life product[s]."

WRL argues that summary judgment is appropriate because the Brattons were paid over $86,000 in commissions for their work. WRL argues that the Brattons cannot establish element three because the Brattons knew, in advance, that WRL would not be paying additional money for expenses. WRL argues that all of the activities the Brattons

participated in were "preparatory to performance" or "activities that otherwise further [the Brattons'] own economic interests." *See Abrams v. Unity Mut. Life Ins.*, 237 F.3d 862, 863-64 (7th Cir. 2001) (applying New York law). WRL argues that there is no inequity here because the Brattons benefitted from all of the expenses when recruiting new agents—just after the March of 2004 termination, the Brattons received a "top deal" with another carrier and began recruiting the same agents for the new carrier.

The Brattons make a very brief argument that they are entitled to recover the $420,000 they spent to promote WRL fixed life products, because those expenditures were a benefit to WRL.

The court finds that the Brattons have presented sufficient evidence to meet each element of an unjust enrichment claim. They have presented evidence that they conferred a benefit on WRL because, in 2003 and 2004, they promoted and marketed WRL fixed life products and recruited agents and agencies to sell WRL fixed life products. They spent approximately $420,000 for advertisements and travel expenses. They devoted nearly 90% of their resources to building a distribution channel for WRL fixed life products. The court further finds that a reasonable jury could conclude that the Brattons have established elements two and three of the unjust enrichment claim. WRL received the benefit of approximately $500,000 in production and 150 new agents as a result of the Brattons' efforts concerning WRL fixed life products. Additionally, the evidence shows that some of the agents recruited by the Brattons will likely produce large amounts of income for WRL. There is sufficient evidence for a jury to find that WRL would not have received these benefits had Gary Bratton and Randy Bratton merely entered into Appointment Agreements. Therefore, the breach of contract claim or other remedies at law are not adequate to address the Brattons' claim.

Accordingly, the court shall deny WRL's Motion as to the Brattons' unjust enrichment claim.

### 2.  *Implied-in-fact contract for services (quantum meruit)*

WRL argues that the Brattons did not work gratuitously for WRL because WRL paid the Brattons over $86,000 in commissions in 2003 and 2004. They argue that the Brattons received the benefit of their bargain because the Brattons knew that WRL would not pay them the requested $15,000 per month marketing allowance and the Brattons explicitly agreed in their Appointment Agreements to bear their own marketing costs.

In the Brattons' Resistance, they briefly argue that the simple receipt of commissions cannot defeat their claim for unjust enrichment. They argue that "WRL [has] not demonstrated the absence of a genuine issue of material fact that the Brattons' services were reasonably worth only $86,000."

The Iowa Supreme Court has stated that, in order to find an implied-in-fact contract to pay for services, the party seeking recovery must show the following:

> (1)  the services were carried out under such circumstances as to give the recipient reason to understand:
>
>> (a)  they were performed for him and not some other person, and
>>
>> (b)  they were not rendered gratuitously, but with the expectation of compensation from the recipient; and
>
> (2)  *the services were beneficial to the recipient*.

*Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 652 (Iowa 2004) (citing *Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 30 (Iowa Ct. App. 2000) (emphasis in original). Sometimes, an offer can be accepted by silence. *See id.* at 651. The Restatement (Second) of Contracts provides:

> Ordinarily an offeror does not have power to cause the silence
> of the offeree to operate as acceptance. . . . The exceptional
> cases where silence is acceptance fall into two main classes:
> those where the offeree silently takes offered benefits, and
> those where one party relies on the other party's manifestation
> of intention that silence may operate as acceptance.

Restatement (Second) of Contracts § 69, cmt. a (1981). The Iowa Supreme Court cited and expressed approval for this Restatement comment in *Roger's Backhoe*, 681 N.W.2d at 651, and affirmed the district court's finding that the offeree's silence established acceptance in an implied-in-fact contract. *Id.*

The court finds that the Brattons have presented sufficient evidence to survive summary judgment on their quantum meruit claim. A reasonable jury could find an implied-in-fact contract for services is established here. First, the Brattons have presented evidence that they courted WRL representatives between November of 2002 and January of 2003 in an effort to become the exclusive national distributor of WRL fixed life products. While there is evidence that the Brattons were not the *exclusive* national distributor (*see* WRL's Appendix at 146 (May 19, 2003 letter by Gary Bratton in which he writes: "We understand that we do not have an exclusive to market WRL fixed products . . . ."), there is sufficient evidence for a reasonable jury to find WRL's silence was acceptance. For example, neither Kneeland nor any other WRL representative ever responded to Gary Bratton's January 27, 2003 email in which Gary Bratton expressed his expectation that the Brattons would be given "the same consideration" for WRL fixed life products as the iGroup receives for Life Investors products and in which Gary Bratton asked for confirmation that "[i]f these are not your intentions, please let us know." A reasonable jury could conclude that, because the Brattons received subsequent support for their marketing and recruiting efforts from Kneeland and Miller, WRL assented to the

Brattons being an IMO for WRL fixed life products. Moreover, given the fact that Randy Bratton and Melchert created the Commission Schedule entitling the Brattons to the "top level" 135% commission, a reasonable jury could find that WRL, the recipient of the Brattons' services, should have expected to pay for the marketing and recruiting services.

The court finds that the Brattons' quantum meruit claim survives summary judgment. That is, there are genuine issues of material fact regarding whether there was a breach of an implied-in-fact contract for services.

## VII. CONCLUSION

For the foregoing reasons, the court hereby **ORDERS** the following:

(1)   WRL and AEGON's Motion for Summary Judgment (docket no. 99) is **GRANTED IN PART** and **DENIED IN PART**;

(2)   The Clerk of Court shall **DISMISS** all counterclaims against AEGON USA, Inc.;

(3)   The Clerk of Court shall **DISMISS** the Negligent Misrepresentation Counterclaim (docket no. 83 at ¶¶ 77-85) and the Fraudulent Misrepresentation Counterclaim (docket no. 83 at ¶¶ 69-76) as to Western Reserve Life Assurance Company of Ohio; and

(4)   This case will proceed to trial on the following claims:

      (a)   the Brattons' Breach of Contract Counterclaim against WRL,

      (b)   the Brattons' Quantum Meruit Counterclaim against WRL,

      (c)   the Brattons' Unjust Enrichment Counterclaim against WRL,

(d)    the Brattons' Promissory Estoppel Counterclaim against WRL, and

(e)    the unresolved issues in WRL's Complaint for Declaratory Judgment.

**IT IS SO ORDERED.**

**DATED** this 10th day of May, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA