# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

WESTERN RESERVE LIFE
ASSURANCE COMPANY OF OHIO,

     Plaintiff/Counterclaim-Defendant,

vs.

G. RANDALL BRATTON, BRATTON
FINANCIAL SERVICES
CORPORATION, BRATTON
INTERNATIONAL, INC. and BETTY
BRATTON, as personal representative of
the Estate of Gary G. Bratton,

     Defendants/Counterclaim-Plaintiffs,

No. 04-CV-81-LRR

**FINDINGS OF FACT,
CONCLUSIONS OF LAW
AND JUDGMENT**

———————————

## *TABLE OF CONTENTS*

*I.*    *INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND*  . . .  2

*II.*    *FINDINGS OF FACT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *A.*    *Parties & Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        *1.*    *WRL & AEGON* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        *2.*    *Brattons* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        *3.*    *Bayfront* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
        *4.*    *Charles Roberts* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
    *B.*    *Brattons' Other Carriers* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        *1.*    *Lincoln Benefit* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        *2.*    *Surety Life* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
        *3.*    *Great American* . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
        *4.*    *American Investors* . . . . . . . . . . . . . . . . . . . . . . . . . **12**
    *C.*    *Beginning of the End* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
    *D.*    *Proposal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
    *E.*    *Conference Call & Game Plan* . . . . . . . . . . . . . . . . . . . . . . **21**
    *F.*    *Marketing & Recruiting Efforts Prior to June 15, 2003* . . . . . . . . . **24**
    *G.*    *April 18, 2003 Home Office Visit* . . . . . . . . . . . . . . . . . . . . **25**

| | | |
|---|---|---|
| H. | *Commission Schedule* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *27* |
| I. | *June 15, 2003 Products Launch* . . . . . . . . . . . . . . . . . . . | *29* |
| J. | *Gary's Appointment Agreement* . . . . . . . . . . . . . . . . . . . . . . . | *29* |
| K. | *Taste of Iowa Meeting* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *30* |
| L. | *Marketing Efforts & Communications* . . . . . . . . . . . . . . . . . . | *31* |
| M. | *Bumps in the Road* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *33* |
| N. | *Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *35* |
| O. | *After the Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *38* |
| P. | *Numbers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *39* |
| Q. | *Other IMOs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *41* |
| | | |
| **III.** | **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **42** |
| A. | *Breach of Contract Claim* . . . . . . . . . . . . . . . . . . . . . . . . . | *42* |
| | 1. *Integration* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *42* |
| | 2. *Oral contract* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *43* |
| B. | *Promissory Estoppel Claim* . . . . . . . . . . . . . . . . . . . . . . . . | *48* |
| C. | *Implied-in-Fact Contract for Services (*Quantum Meruit*) Claim* . . . | *52* |
| D. | *Unjust Enrichment Claim* . . . . . . . . . . . . . . . . . . . . . . . . . | *53* |
| | | |
| **IV.** | **JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **55** |

## I. INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND

Plaintiff/Counterclaim-Defendant Western Reserve Life Assurance Company of Ohio ("WRL") is an insurance company that is qualified and licensed to transact business in Iowa. Defendant/Counterclaim-Plaintiffs G. Randall Bratton, Bratton Financial Services Corporation, Bratton International, Inc. and Betty Bratton, as personal representative of the Estate of Gary G. Bratton, (hereinafter collectively referred to as "Brattons"), comprise an independent marketing organization ("IMO"). Both Gary G. Bratton ("Gary Bratton") and G. Randall Bratton ("Randy Bratton"), father and son respectively, entered into appointment agreements with WRL. The Brattons allege that they also entered into a "gentlemen's agreement." The so-called gentlemen's agreement is alleged to be a nearly-exclusive, oral, indefinite contract to market nationally WRL's fixed life products.

2

The matters before the court are WRL's Complaint for Declaratory Judgment ("Complaint") (docket no. 2-1) and the Brattons' Second Amended Answer and Counterclaims and Jury Demand ("Counterclaims") (docket no. 83).

On June 26, 2004, WRL filed the Complaint. On July 27, 2005, the Brattons filed the Counterclaims.[1]

On May 10, 2006, the court filed an order on WRL's motion for summary judgment. The court dismissed two of the Brattons' Counterclaims. The Counterclaims that survived summary judgment include claims for breach of contract, promissory estoppel, *quantum meruit* and unjust enrichment.

On May 18, 2006, the parties filed a joint stipulation to waive jury trial, and the court accepted it. On May 19, 2006, the court filed an order regarding WRL's motion in limine.

On May 23, 2006, the court commenced a bench trial on the Complaint and Counterclaims. The court adjourned the bench trial shortly after it began due to the death of Gary Bratton.[2] The bench trial commenced again on December 4, 2006, and, on December 6, 2006, it concluded. Attorneys Wilford H. Stone and Amy L. Reasner represented WRL. Attorneys Jason Gregory Wolfkill and Bruce S. Kramer represented the Brattons.

---

[1] In the April 14, 2005 third-party complaint (docket no. 70), the Brattons named AEGON Financial Partners as the third-party defendant. In the Counterclaims, they replaced AEGON Financial Partners with AEGON USA, Inc. The court dismissed the claims against AEGON USA, Inc. at the summary judgment stage of the case. *See* Order (docket no. 133, at 50).

[2] When the bench trial commenced, Gary Bratton was a defendant and counterclaim-plaintiff. On May 23, 2006, during the trial, Gary Bratton passed away. On July 6, 2006, the court granted Betty Bratton's motion for substitution of party due to Gary Bratton's death. (docket no. 152).

3

On December 6, 2006, the Brattons made an oral motion for an order requiring WRL to produce certain documents ("Motion for Production"). On December 7, 2006, the court granted the Motion for Production and admitted additional exhibits into evidence. *See* Order (docket nos. 160 & 163).

After the close of the Brattons' case and at the close of all of the evidence, WRL made oral motions for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) ("Rule 52(c) Motions") (docket no. 157).[3] The court reserved ruling on the Rule 52(c) Motions. Because the case is fully submitted and the court makes findings pursuant to Rule 52(a)[4] herein, the court shall deny as moot the Rule 52(c) Motions.

At the close of the trial evidence, the court reserved ruling and allowed the parties to submit written closing arguments. On December 14 and 15, 2006, WRL and the Brattons filed their respective written closing arguments. (docket nos. 162 & 165).

The court finds the matter fully submitted and ready for decision. This order constitutes the court's Federal Rule of Civil Procedure 52(a) findings of fact and conclusions of law.

---

[3] Federal Rule of Civil Procedure 52(c) provides, in part: "If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue . . . ." Fed. R. Civ. P. 52(c).

[4] Federal Rule of Civil Procedure 52(a) provides, in part: "In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. . . . It will be sufficient if the findings of fact and conclusions of law . . . appear in an opinion or memorandum of decision filed by the court." Fed. R. Civ. P. 52(a).

4

## II. FINDINGS OF FACT

After assessing the credibility of the witnesses, the court finds the following facts by a preponderance of the evidence:

### A. Parties & Players

#### 1. WRL & AEGON

WRL is an insurance company that is qualified and licensed to transact business in Iowa. AEGON USA, Inc. ("AEGON") is a holding company that owns WRL. AEGON has several carrier companies, including: WRL, Life Investors Insurance Company of America ("Life Investors"), Transamerica Occidental ("Transamerica") and "Peoples Benefit Life Insurance ("Peoples Benefit"). Each of these AEGON-affiliated carrier companies issue nearly identical insurance products under their respective names to build more distribution networks for AEGON insurance product sales.

In 2000, Mike Kirby became WRL's Chairman and Chief Executive Officer ("CEO"), and he remained in that position in 2002 through early 2004. In 2003, John Kneeland was WRL's Vice President of Sales. He had been in the life insurance business since 1972. Paul Reaburn was WRL's Chief Operating Officer.

#### 2. Brattons

In 2002 and 2003, Gary Bratton and Randy Bratton's combined experience in the insurance industry totaled over fifty years. Gary Bratton was a Certified Public Accountant ("CPA") who worked for two major accounting firms for about six years after obtaining his Masters in Business Administration ("MBA") in 1970. Gary Bratton entered the insurance business in 1978. Beginning in 1980, Gary Bratton served as the Chief Financial Officer and Vice President of Finance of a public company, Mid Continent Systems, Incorporated. Gary Bratton later became the President of the public company, but he left it in 1983.

5

In 1983, Gary Bratton started the insurance business that became Bratton Financial Services Corporation ("BFSC"). In May of 2006, the shareholders of BFSC were Randy Bratton, Gary Bratton, Betty Bratton (Gary Bratton's wife) and Marla Bratton (Randy Bratton's wife). Bratton International, Inc. is a corporation that was formerly known as IMG International [hereinafter collectively referred to as "Bratton International"]. The trade name for Bratton International and BFSC is the Bratton Companies. The Bratton Companies' primary office is in Memphis, Tennessee. Between 2002 and May of 2006, Gary Bratton and Randy Bratton were 50/50 partners in the Bratton Companies, but they did not have any partnership documents between the two of them.

The Bratton Companies are an IMO. IMOs market life insurance products and drive the production for one or more insurance companies. An IMO recruits agents and agencies. An IMO can have 5,000 or 6,000 agents who are contracted with an insurance company through the IMO. General agencies, on the other hand, typically only have about one hundred agents contracted through the agency. IMOs focus on recruiting and supporting insurance agents, rather than selling individual policies. An IMO's recruited agencies often recruit individual agents. Both the agents and agencies are referred to as an IMO's "distribution" or "downline." At any given time, IMOs promote and market the products of more than one carrier. IMOs do not typically market exclusively for one life insurance company. Rather, IMOs limit their marketing efforts to one or two carriers and sell for several companies.

### 3. *Bayfront*

For a period in 2003 and 2004, the Bratton Companies worked in a parallel business relationship with Bayfront Financial ("Bayfront"), another IMO. Jesse Dunagan and Fred Johnson were Bayfront's two principals. Bayfront marketed WRL's annuity products, and the Bratton Companies marketed two types of WRL life insurance products—term life

6

insurance and universal life insurance.[5]  The Bratton Companies distributed WRL's fixed annuity products through Bayfront.

### 4.    Charles Roberts

Charles Roberts was a principal with the Bratton Companies during part of the period when the Brattons were involved with WRL.  Roberts met the Brattons in the late 1980s.  At that time, Roberts was an employee of Surety Life Insurance Company ("Surety Life").  Roberts was a home office employee who was responsible for Surety Life's sales force for a certain region of the nation.  In the late summer of 1999, Roberts began working for Great American Life Insurance Company ("Great American").

On January 1, 2002, Roberts started working for the Bratton Companies.  He performed general marketing and recruiting tasks for the Bratton Companies.  The Brattons had a written stock option agreement with Roberts, which Roberts never exercised.  Roberts had insurance company contracts under the umbrella of the Bratton Companies.  Beginning in mid-2003, Roberts had a contract with WRL.

### B.   Brattons' Other Carriers

### 1.    Lincoln Benefit

On April 13, 1994, Randy Bratton signed an "Agent Sales Contract" and an "Area Sales Manager Addendum to Agent Sales Contract" with Lincoln Benefit Life Company ("Lincoln Benefit"), which permitted him to sell Lincoln Benefit products and to receive override commissions if his production reached a certain level.  (Trial Exs. 25-136; 25-137 to 25-138).  The Agent Sales Contract provided for termination without cause upon thirty

---

[5]  Term life insurance is a type of insurance that requires the insured to pay a fixed amount of premium for a particular period of time—typically ten, fifteen or twenty years.  If death occurs during the premium payment period, then the life insurance amount is payable to the beneficiary.  If the insured continues to live beyond the period, then the policy expires without value.  Universal life insurance, which is also known as "permanent insurance" or "cash valued insurance," is more complex.  With universal life insurance, a portion of the premium is paid into a cash value account that earns interest.

7

days written notice.  (Trial Ex. 25-138, at ¶ B).  On May 2, 1994, Randy Bratton signed an "Executive Sales Director Addendum to Agent Sales Contract" with Lincoln Benefit, which was retroactively effective back to April 1, 1994.  (Trial Ex. 25-134).  This Executive Sales Director Addendum also entitled Randy Bratton to override commissions for the production of agents in his downline.  (*Id.*).  On August 10, 1999, Randy Bratton signed an "Executive General Agent's Agreement—Appointment" with Lincoln Benefit.  (Trial Ex. 25-139 to 25-141).  This Executive General Agent's Agreement—Appointment provides, in part:

> **Authority—**You are authorized to develop and supervise [Lincoln Benefit's] business in conformity with the rules and regulations of [Lincoln Benefit].  You shall recruit and recommend persons for appointment by [Lincoln Benefit] as agents and shall train and supervise such agents . . . .
>
> . . .
>
> **Expenses—**You shall pay all expenses of every nature incurred in connection with the conduct of your business, and [Lincoln Benefit] shall not be liable in any way therefor.
>
> . . .
>
> **Compensation—**For the purpose of determining compensation, your compensation shall include not only your personal production, but also the production of all agents assigned to you . . . .
>
> . . .
>
> **Termination—**Either party may terminate this Agreement by giving written notice. . . .

(Trial Ex. 25-139 to 25-141).  Also on August 10, 1999, Gary Bratton signed a "Master Brokerage Agent's Agreement—Appointment" with Lincoln Benefit.  (Trial Ex. 25-142

8

to 25-143).  It contained provisions that were very similar to the provisions in Randy Bratton's Executive General Agents Agreement—Appointment.

On November 30, 2001, Gary Bratton and Roberts presented a document titled, "Summary, Top Line Business Plan" ("Lincoln Benefit Proposal") to B. Eugene Wraith, President of Lincoln Benefit.  (Trial Ex. 25-145 to 25-155).  The Lincoln Benefit Proposal projected five years worth of sales.  (Trial Ex. 25-149).  The Bratton Companies included the following weighted production[6] sales projections:  $5,000,000.00 for 2002, $7,500,000.00 for 2003, $10,000,000.00 for 2004, $15,000,000.00 for 2005, and $22,500,000.00 for 2006.  (*Id.*).

At the time of trial, the Brattons remained in good standing with Lincoln Benefit. The Brattons were considered one of several of Lincoln Benefit's Master Broker Agents. At the time of trial, Lincoln Benefit had a "good number," that is, about fifty, contracted Master Broker Agents, including the Brattons, who were allowed to market nationally. Therefore, there was no exclusivity.

### 2.    *Surety Life*

On October 27, 1998, the Bratton Companies entered into a Regional Director Sales Contract with Surety Life.  (Trial Exs. 25-170 to 25-177).   As Regional Director, the Brattons engaged in recruiting, training and supervising agents, and supporting, assisting and developing Surety Life's business in Tennessee, Alabama and Kentucky.  (Trial Ex. 25-172, at Section III (setting forth the management activities and supervisory duties of the Regional Director)).

---

[6]    A "weighted target" or "weighted production" is a measure of an IMO's productivity.  Most life insurance companies offer for sale both life insurance and annuity products.  If the overall premium production is expressed as a "life insurance premium total," the total portion of the annuity product premiums is derived by using only a small percentage, 5%, for example, of the total annuity premiums.  Annuity premium is usually expressed as a much smaller percentage of life insurance premium.

9

The Surety Life contract provided that the Brattons could be terminated without cause upon thirty days written notice. (Trial Ex. 25-174). Surety Life provided the Brattons with notice of termination, and, in September of 1999, Surety Life stopped accepting new policy applications. Despite the termination, the Bratton Companies had a weighted production of $538,374.00 for Surety Life in 1999.

### 3.    *Great American*

On January 6, 2000, Randy Bratton signed a "General Agent's Agreement with Power to Appoint" with Great American ("Great American AA"). (Trial Ex. 25-120 to 25-123). The Great American AA allowed Randy Bratton to appoint agents to his downline so that he could earn override commissions. The Great American AA provided that Randy Bratton could be terminated "by either party with or without cause immediately." (Trial Ex. 25-121, at ¶ 12(c)).

Beginning in about September of 1999, the Bratton Companies were one of five national IMOs that marketed Great American products. The Bratton Companies entered into a relationship with Great American approximately two years after the four other IMOs began marketing Great American term life and universal life products. Each IMO competed against the other IMOs in the national marketplace, that is, any of the five IMOs could recruit any agent or agency. There was no exclusivity.

By the end of 1999, the Bratton Companies had produced $170,963.00 worth of Great American term life and universal life products. In 2000, the Bratton Companies produced $2,094,736.00 of those products. In 1999 and 2000, Great American production comprised between 80% and 90% of the Bratton Companies' business.[7] Beginning in 2001, the Bratton Companies began marketing Great American's annuity products and continued to market the life insurance products.

---

[7] In 1999, the Bratton Companies had three main carriers: Surety Life, Great American and Lincoln Benefit.

Case 1:04-cv-00081-LRR   Document 168   Filed 06/26/07   Page 10 of 55

On October 19, 2001, Gary Bratton and Roberts presented a document titled, "Summary, Top Line Business Plan" ("Great American Proposal") to David B. Rich, President of Great American. (Trial Ex. 25-108 to 25-117). The Great American Proposal projected five years worth of sales. (Trial Ex. 25-112). The Bratton Companies included the following weighted production sales projections: $5,000,000.00 for 2002, $7,500,000.00 for 2003, $10,000,000.00 for 2004, $15,000,000.00 for 2005, and $22,500,000.00 for 2006. (*Id.*).

In the Great American Proposal, the Brattons asked Great American for several areas of support, including a $10,000.00 monthly marketing allowance, recognition of the Bratton Companies as a "full pledged, marketing organization," and a 28% marketing organization bonus. (Trial Ex. 25-115). The Bratton Companies became a national marketing organization for Great American, and Great American paid the Brattons bonuses of 28% pursuant to the Great American Proposal and an oral agreement. In about 2002 and 2003, Great American orally agreed to give the Brattons a $10,000.00 per month marketing allowance for one and a half years to assist in the Brattons' marketing efforts. Additionally, the Brattons entered into specific oral agreements with Great American for reimbursement of certain expenses, for example, the Brattons' attendance at a recruiting meeting.

In 2001, the Bratton Companies had a weighted production for Great American of $2,646,102.04, and the Great American products constituted about 90% of the Bratton Companies' business that year. In order to reach that amount of production in 2001, the Bratton Companies had appointed between 1,800 and 2,000 agents to sell Great American products. In 2002, the Bratton Companies had a weighted production for Great American of $2,344,053.88, and the Great American products constituted most of the Bratton Companies' business that year. In 2002, the Bratton Companies had over 1,000 agents in their downline.

11

The Bratton Companies' weighted production in 2003 was significantly lower than in the previous years, because Great American was undergoing many internal changes and agents were leaving Great American. In late 2002 and early 2003, it became clear to the Brattons that they would not be marketing Great American for an extended period of time. The Brattons believed that WRL would be a good replacement company for Great American. In December of 2003, Great American officially announced that it was leaving the life insurance business and that it would not accept new business after April 30, 2004.

### 4. *American Investors*

On November 11, 2002, Gary Bratton represented BFSC and entered into a marketing contract with American Investors Life Insurance Company, Inc. ("American Investors") on BFSC's behalf. (Trial Ex. 25-15 to 25-21 (hereinafter referred to as "AI Marketing Contract"). On November 18, 2002, an "Independent Marketing Organization Commission Schedule" became effective and set the commission rates for the Bratton Companies' marketing efforts. (Trial Ex. 25-22). In a letter dated November 20, 2002, American Investors informed Gary Bratton that the AI Marketing Contract had been fully executed. (Trial Ex. 25-14). The AI Marketing Contract provided that it would remain in effect for one year and automatically renew, unless either party gave forty-five days notice of non-renewal. (Trial Ex. 25-18, at ¶ 9). It provided that a ground for termination would be lack of production. (Trial Ex. 25-18, at ¶ 11(A)). For example, it provided that, if the Bratton Companies, as an IMO, failed to "produce premium at the rate of at least $2 million" during the first six months of the AI Marketing Contract, then American Investors could terminate them upon forty-five days written notice. (*Id.*). There was a similar provision for failure to produce $4 million in the second six months and $10 million in the following years. (*Id.*).

On June 25, 2003, seven months after he had signed the AI Marketing Contract, Gary Bratton received a letter from American Investors that terminated the AI Marketing

12

Contract and the Brattons' downline agents. (Trial Ex. 25-13). The Brattons only had about five downline agents and had put virtually no effort into marketing American Investors' products. In June of 2003, American Investors reorganized and eliminated all IMOs except the IMOs with whom they had "very long-standing relationships." The termination did not surprise Randy Bratton.

### C. Beginning of the End

In 2000, WRL was offering mainly stock market or securities based products. Due to the fact that the market began retracting very aggressively, WRL officers began looking for ways to grow its distribution and expand away from the securities-based products.

On November 1, 2002, and, due in part to the Brattons' relationship with Dunagan and Johnson of Bayfront, Randy Bratton signed an appointment agreement with AEGON Insurance Group ("Randy's Appointment Agreement"). (Trial Ex. 23).[8] Randy's Appointment Agreement contains language that is standard in the industry. Among other provisions, Randy's Appointment Agreement provides that Randy Bratton is an independent contractor of WRL (Trial Ex. 23-1, at ¶ 2), that he may not advertise on behalf of WRL unless WRL has approved of the advertisement in advance in writing (*id.*), that he is responsible for "all expenses" that he incurs (*id.*) and that he can be terminated without cause upon thirty days written notice (*id.* at ¶ 6(a)(1)). In the industry, the standard notice provision for termination in appointment agreements for agents and IMOs is thirty days.

Randy's Appointment Agreement also provides: "This [a]greement terminates and replaces any prior agreement between [WRL] and [Randy Bratton]. This [a]greement can only be amended by a document signed by [WRL]." (*Id.* at ¶ 8). Randy Bratton, however, did not have any agreement with WRL prior to November 1, 2002.

---

[8] Randy's Appointment Agreement is the standard appointment agreement form used by AEGON's Florida office.

Case 1:04-cv-00081-LRR    Document 168    Filed 06/26/07    Page 13 of 55

Randy's Appointment Agreement further provides that it would take effect when WRL signed a schedule and appointed Randy Bratton "as its insurance agent according to applicable law." (*Id.* at ¶ 8). Randy Bratton had two schedules with WRL (Trial Exs. 24 & Q), but only one is a schedule that was signed by WRL (Trial Ex. Q).[9] The signed schedule for Randy's Appointment Agreement ("Randy's Annuity Schedule") only listed the commission rate at which Randy Bratton would be paid for sales of WRL's fixed annuity products. (Trial Ex. Q). Randy Bratton was given a copy of Randy's Annuity Schedule on November 1, 2002, but Randy's Annuity Schedule was not signed by a WRL representative until March 20, 2003, that is, the date when it was signed by WRL officer David Miller.[10] (*Id.*).

On November 6, 2002, Randy Bratton, Gary Bratton, Roberts, Dunagen and Johnson met with WRL officers at WRL's offices in Clearwater, Florida. Representatives from about six other IMOs were also present at the meeting. The purpose of the meeting was to introduce all of the agents to WRL's fixed annuity products.

After the meeting, Kirby met with the Brattons, Roberts, Dunagan and Johnson. Kirby thanked everyone for coming to WRL's home office. The Brattons approached Kirby about the possibility of rebranding[11] some of the existing AEGON fixed life

---

[9]    The Bratton Companies had a separate schedule with WRL for life insurance products ("Commission Schedule") that will be discussed *infra* in Part II.H. (Trial Ex. 24).

[10]    David Miller is an AEGON officer who is very established and influential. He set up the relationship between Larry Earl's iGroup and Life Investors. (*See infra* Part II.D. for the court's findings on the iGroup). David Miller is Seth Miller's father. (*See infra* Part II.E. for the court's findings about Seth Miller's status at AEGON).

[11]    Rebranding is a term that refers to the action that is taken when a company like AEGON, that has many carriers (*e.g.*, Life Investors, WRL, Transamerica and Peoples Benefit), takes a product that it is selling under one carrier and renames it for marketing

(continued…)

Case 1:04-cv-00081-LRR    Document 168    Filed 06/26/07    Page 14 of 55

insurance products as WRL products, and the group discussed the idea. Kirby presented the group with a comprehensive list of insurance products that were part of the AEGON family of products. The Brattons told Kirby that they would like the opportunity to market those products through the Bratton Companies. Kirby told the Brattons to take the list and choose a couple of the products that they wanted to market, and then the products would be rebranded to become WRL products. Kirby expressed a general interest in having the Brattons market life insurance products, in addition to the commitments that they had already made to selling WRL's fixed annuity products through Bayfront. At the end of the meeting, Kirby and the Brattons agreed that the Brattons would put together a business proposal about how the Brattons planned to introduce WRL's rebranded fixed life insurance products. Kirby and the Brattons talked about the fact that it takes some time to start up an operation like the one they were proposing, and the Brattons stated that they expected to have the distribution mature and operational in about five years. Kirby concurred with the Brattons' expectation.

### D.  Proposal

The Brattons prepared a document titled: "A Proposal for WRL for the Organization and Management of A Fixed Life Insurance Products Division" (hereinafter "Proposal"). (Trial Ex. 4). On December 11, 2002, Gary Bratton sent the Proposal via overnight delivery to Kirby, Dunagan and Johnson. In the "Sales Projections" portion of the Proposal, the Brattons state, in part:

> In the judgment of [the Bratton Companies'] managment, the company and WRL should strive for three to five million dollars of fixed life target premium production during its first 12 months of operation.

---

[11](…continued)
under another carrier.

- Year One Time Line: Production should flow at approximately the following rate:

From product approvals by the licensing jurisdictions through the first three months of operation, $300,000 - $500,000 production in life target premium.

Months four through six, $500,000 - $1,000,000 target premium.

Months seven through nine, $900,000 - $1,500,000 target premium.

Months ten through twelve, $1,300,000 - $2,000,000 target premium.

The management of [the Bratton Companies] believes that $3,000,000 - $5,000,000 in life target premium production for the first year of operation is both realistic and manageable. These projections assume that WRL has the required product approvals and home office support functions in place to handle this volume of business. The projections described above are based on submitted premium volume, since WRL has ultimate control of issued premium.[12]

(Trial Ex. 4-7 to 4-8). There is no document in existence that amended this first year sales projection of $3,000,000.00 to $5,000,000.00.

_____

[12] The phrase "submitted premium volume" refers to the total dollar amount of the life insurance applications that are sent into WRL's home office by agents for approval and underwriting. No one is paid on submitted cases. The phrase "issued premium volume" is synonymous with "paid premium volume" and refers to the total dollar amount of the life insurance policies that have made it through the underwriting process, that is, individuals have entered into contracts and are paying premiums. Submitted premiums are never equal to issued premiums because some applications are denied and others are withdrawn.

16

However, in the Proposal, the Bratton Companies requested certain support from WRL. The Proposal stated:

> Requested Support From [WRL]
>
> To effectively establish WRL's fixed life products in the independent life brokerage marketplace, [the Bratton Companies] will need quality products, back office support, adequate compensation, agent incentives, and financial support from WRL, as described in the following paragraphs.
>
> <u>Products Needed</u>: To effectively control distribution, insure quality and earn a major portion of the business of those agents contracted to WRL, [the Bratton Companies] will need a complete portfolio of products, including level term, universal life, and whole life. . . .

(Trial Ex. 4-8). Then, the Proposal detailed the products the Bratton Companies were seeking. (Trial Exs. 4-8 to 4-10).

On January 15, 2003, Kirby, Kneeland and Reaburn visited the Bratton Companies' offices in Memphis, Tennessee, for a meeting regarding the Proposal. The Brattons made a PowerPoint presentation titled "Marketing Partnership Proposal" ("PowerPoint Presentation") (Trial Ex. 6) and presented it at the meeting. The PowerPoint Presentation included a page titled "Proposal to WRL," which included premium volume projections for five years. The Brattons projected submitted premiums of $3,000,000.00 to $5,000,000.00 for "Year One" and $50,000,000.00 for "Year Five." The Brattons chose to project five years worth of production, because that is a bench mark for an accounting period. The Brattons stated that the projections were "Very Achievable." In the PowerPoint Presentation, the Brattons listed the expectations they had for WRL. (Trial Ex. 6-29).

At the meeting where the Brattons presented the PowerPoint Presentation, they represented to WRL that they had contracts with between 3,000 and 3,500 agents and that

the agents had produced "approximately $7,000,000 in weighted premium in 2002." WRL officers understood this information as meaning that the Bratton Companies had existing distribution, that is, agents who would be ready to sell WRL products as soon as the products were licensed. This is called a "plug and play" in the insurance industry—as soon as WRL obtained approval from the states, it could immediately sell the products through the existing distribution.

During the meeting, the Bratton Companies also introduced its team; the Brattons introduced Roberts as the "principal" who would be in charge of "Marketing / Marketing & Industry Relationships" and Alisa Hall who would be the "Recruiting Manager / Communication with New Agents." Both Roberts and Hall were to work out of the Bratton Companies' Cincinnati, Ohio, office.[13] Roberts was a "1099 agent," or a contracted agent. Hall was a "W-2 employee" of BFSC. It was very important to Kirby, Kneeland and Reaburn that Roberts was part of the Brattons' team, because Roberts had just come from working for Great American. Great American was getting out of the life insurance business, so its agents would be looking for new products, and the Brattons told WRL that Roberts had great relationships with numerous Great American agents.

During the January 15, 2003 meeting, the group discussed channel conflicts. Channel conflicts occur when an insurance company has sister companies. Here, for example, WRL, Life Investors, Peoples Benefit and Transamerica are all sister companies under the AEGON umbrella. Ideally, there will be distinct groups of agents for each carrier company, so that a particular agent does not have to choose between two carriers.

---

[13] Beginning in 2002, the Bratton Companies leased office space in Cincinnati, Ohio, from Great American and used the space to recruit insurance agents nationally for WRL and other insurance companies. In the Proposal and during the PowerPoint Presentation, the Brattons represented that the Bratton Companies had a third office in Cadillac, Michigan. In reality, the Michigan "office" was a space in the home of John Bratton, Gary Bratton's son. John Bratton was a minister who sold life insurance and had an in-home office.

18

Therefore, during the meeting, Kirby and Kneeland informed the Brattons and Roberts that there were existing AEGON carriers that had producing agents. The Bratton Companies were instructed to not interfere with those contracts so as to avoid a channel conflict. The Brattons's goal was to bring new agents into the AEGON family. Kirby knew that Larry Earl of the iGroup[14] had previously been affiliated with Great American, but, unlike Roberts, Earl had never been a Great American employee. Kirby also knew that there were about ten thousand agents contracted to sell Life Investors's fixed life products and Peoples Benefit's fixed life products and that each of those agents would be conflicted out of contracting to sell WRL's fixed life products.

During the January 15, 2003 meeting, Kirby stated that he liked to have one IMO representing each AEGON carrier. He preferred to have one IMO heading up each of WRL's product lines rather than having different IMOs competing with each other for agents in the marketplace. However, Kirby did say that AEGON does not give any IMO or group an exclusive opportunity to market and sell a particular product. These are known as "exclusives" in the industry. Kirby did not want to put all of WRL's "eggs in one basket," and WRL could not give the Brattons an exclusive, because WRL already had existing distribution channels at the time they first spoke with the Brattons. Kirby was excited about the Proposal and about moving ahead. Everyone who attended the meeting was ready to proceed.

After the January 15, 2003 meeting, Randy Bratton drove Kneeland to the airport. The two discussed moving forward, and Kneeland handed Randy Bratton a spreadsheet of some of the WRL products. Kneeland told Randy Bratton that the Brattons would be selling the products listed on the spreadsheet. Randy Bratton understood the conversation

---

[14] The iGroup is a consortium of independent life agencies which operates as an IMO. The iGroup was the IMO that marketed Life Investors products for AEGON, and Earl was the iGroup's principal.

to mean that the Brattons had a deal with WRL regarding the Proposal, that is, the Brattons understood that they would be marketing WRL's fixed life products.

Throughout all of the discussions regarding the Proposal, there was an implicit understanding that the Brattons would be compensated through commissions only—commissions based upon the policies they sold themselves and override commissions. To calculate an override commission, one begins with the "total payout" amount. The "total payout" is the total amount of commission that the insurance company pays upon issuance of a policy. The total payout for a term life insurance product is 135% of the first year annual premium. The override commission is the difference between the total payout and the commission payable to the selling agent. For example, if the selling agent contracted to receive commission at 100%, then the Brattons would receive 35% from WRL.

At no time during the meeting did Kirby make any promises or guarantees about the period of time WRL would give the Bratton Companies to market WRL's fixed life products. In the insurance industry, it is very common to discuss the future in terms of "the next five years" or "the five year game plan." Kirby, however, did not leave the meeting understanding that the Brattons were proposing to market for WRL for a five-year period of time. Kirby accepted the Proposal and agreed to give the Brattons an opportunity to see if they could produce the numbers that they projected in the Proposal. Kirby did not view the numbers as a commitment that the Brattons would produce the exact numbers that they projected. Moreover, Kirby and the Brattons never discussed the idea that the Bratton Companies would stop marketing for other carriers and devote all of their time to WRL. WRL did not require or expect that the Brattons would stop marketing for other carriers. Kirby and other WRL representatives never told the Brattons how to run their business, including whether they should hire a marketing director or how to market WRL's fixed life products.

20

### E. Conference Call & Game Plan

On January 17, 2003, Gary Bratton wrote to Kirby. Such letter discusses a conference call that would take place on January 24, 2003. In the letter, Gary Bratton wrote: "Randy [Bratton], [Roberts] and I have been tossing around some ideas about how best to roll out the new products for WRL. Hopefully we can have some kind of game plan to you before our conference call." (Trial Ex. 7).

On January 21, 2003, Gary Bratton sent Kirby a document called "Proposed Game Plan for Fixed Life Products Introduction" ("Game Plan") (Trial Ex. 8). The Game Plan was a ten-page document which detailed the Bratton Companies' plan for the following:

1. rebranding agent contracts and assembling a commission grid,
2. rolling out the product on June 1, 2003,
3. putting distribution in place for WRL's fixed life products,
4. avoiding channel conflicts, and
5. training regional marketing organizations ("RMOs") by conducting an introductory sales and motivational meeting on the target date of May 29, 2003, with a detailed agenda for that meeting.

The Game Plan also lists forty-nine RMOs or "targeted agents" by name and city location. In the cover letter to the Game Plan, Gary Bratton referenced the "plug and play" idea: "I believe that we can realistically expect to have around 30-40 [RMOs] in place before the initial product rollout. If each of these agencies would contract five to ten agents, we would have several hundred agents ready to sell, right out of the gate." (Trial Ex. 8-1).

21

On January 24, 2003, Randy Bratton, Gary Bratton, Kneeland and Seth Miller[15] all participated in a conference call. The purpose of the conference call was to start the Brattons off selling WRL's fixed life products. Kneeland and Seth Miller welcomed them. The Brattons had previously requested a total payout amount of 140%, but during this conference call, Kneeland told them for the first time that they would receive a payout of 135%, which was acceptable to the Brattons. Moreover, Kneeland told the Brattons that he wanted to limit the top agencies to 120% commission. Seth Miller made a complimentary remark to the Brattons during the call. He stated that, based on the Proposal, he could tell that it was not the Brattons' "first day at the rodeo." Seth Miller welcomed the Brattons to AEGON and told them that he was looking forward to working with them.

On January 27, 2003, Gary Bratton emailed Kneeland (and copied Randy Bratton and Roberts). (Trial Ex. 9). The subject line of the email read: "Conference Call 1/24/03." Gary Bratton wrote, in part:

> [Kneeland], thanks for participating in the conference call last Friday. We're delighted to be heading up the fixed life products distribution for WRL, and I assure you we'll do a good job for you!

(Trial Ex. 9). The Brattons understood that the Bratton Companies would be the primary agency that would be representing WRL's fixed life products to other agents across the nation. However, the Brattons acknowledge that Kirby resisted using the word "exclusive" to describe WRL's relationship with the Bratton Companies.

---

[15] At the time, Seth Miller's title was Vice President of Independent Producer Marketing, and he worked with five IMOs on a variety of issues. The Brattons understood that Seth Miller was affiliated with AEGON and was to be the "field / market VP" or "home office liason" for the Bratton Companies. Seth Miller had not attended the January 15, 2003 meeting because he was on vacation at that time.

22

In a reply email by Kneeland on the same date, Kneeland stated:

> Greetings Gary [Bratton]! We are also looking forward to having the [Bratton Companies] marketing the WRL "fixed" products. "Heading up the distribution for WRL" might be a little strong. (:-)

(Trial Ex. 10). The reply email was sent to Gary Bratton, Randy Bratton, Roberts, Seth Miller, Kirby, Reaburn, Kneeland and David Miller. Kneeland signed the email "John & Seth," indicating that he and Seth Miller composed the email together.

In an additional email by Gary Bratton on January 27, 2003, titled "Your e-mail of 1/27/2003," Gary Bratton wrote, in part:

> My comment about our heading up the WRL fixed life distribution was meant to say that with the exception of your existing [AEGON] distribution, you would afford us the same consideration as you do the iGroup. As long as we're doing a good job for you, I would hope that you would not contract agents directly to the company and that you would refer agent inquiries to us. Also, as I mentioned in our presentation and conversation in Memphis if you decide to contract any other group at our contract level, I would hope that you would give us some advance notice. If these are not your intentions, please let me know.

(Trial Ex. 11-1). Gary Bratton wrote more about desiring a system for avoiding channel conflicts and then stated: "Thanks again, [Kneeland]. We look forward to ironing out these details and getting started!" (Trial Ex. 11-1). No one from WRL ever responded to this email.

On February 14, 2003, Gary Bratton sent Kirby a letter. (Trial Ex. 12). The Brattons were asking for a $15,000.00 per month marketing allowance. (*Id.* at 12-1). The letter requested this allowance to offset half of their travel expenses and most of Hall's salary and benefits. (*Id.*).

During the negotiations and presentations, there was never any mention of a termination provision aside from the thirty-day termination provisions in Randy's

Appointment Agreement. Because there was no discussion of the issue, the Brattons did not know how much notice they would have to give WRL if the Bratton Companies wanted, for whatever reason, to stop working with WRL. There were no agreements made regarding grounds for termination.

### F. Marketing & Recruiting Efforts Prior to June 15, 2003

On January 29, 2003, Gary Bratton and Kneeland exchanged emails seeking approval for WRL products in Puerto Rico, Guam, the U.S. Virgin Islands and American Samoa. At the end of Gary Bratton's email to Kneeland, he wrote: "We're truly excited about our partnership with you." (Trial Ex. 11-2).

After the January 24, 2003 conference call, the Brattons began working to bring WRL's fixed life products to the market. The products were not yet available for sale,[16] and the Brattons had not yet received permission from AEGON's Director of Product and Marketing Support Deb Hagedorn to sell them. However, the Brattons were in fairly constant contact with WRL representatives, who knew that the Brattons had begun cultivating their existing agent relationships and advising their contacts of the upcoming release of WRL's fixed life products. The Brattons targeted larger agencies, with whom they had existing relationships, and larger agencies that they knew through their membership in the national insurance association. The Brattons felt that it was necessary to target these large agencies, because the agencies had established distribution chains in the field and it would enable the Bratton Companies to generate a lot of premium volume sooner. Instead of recruiting one agent at a time, they chose to target agencies in the hopes of recruiting dozens or hundreds of agents at a time. The challenge that is inherent in recruiting such agencies is that the larger agencies have production commitments with

---

[16] When products are rebranded, the insurance company has to seek approval from the insurance department of each state where the products will be sold. The state has to approve the product before it can be sold within the state. IMOs generally do not start marketing products until half of the states approve the particular product.

other carriers. Because these large agencies sell insurance with other companies, it generally takes a long time to convince them to commit to a new carrier, like WRL.

On April 1, 2003, Gary Bratton sent a letter to Kirby and copied Kneeland. Gary Bratton wrote, in part:

> We have verbal commitments from agencies that we can have in place by June 1, 2003, that will easily enable us to meet the $3,000,000 - $5,000,000 sales commitment for the first 12 months. These are not spreadsheet organizations. Each has been told that [the Bratton Companies] and WRL will demand quality business, and they understand these requirements.
>
> . . . All of this to say (sic) that I am confident that we can meet the five year sales projections that we provided you in January, i.e.[,] $50,000,000 in target premium production in year five. . . .

(Trial Ex. F).

### G. April 18, 2003 Home Office Visit

On April 18, 2003, Gary Bratton, Randy Bratton and Roberts visited WRL's home office in Cedar Rapids, Iowa, for the first time. They received a tour and met with Kirby, Kneeland, Seth Miller, Hagedorn, Pat Melchert[17] and five other WRL representatives.

On May 7, 2003, Kneeland and Seth Miller co-authored a letter to Gary Bratton, Randy Bratton and Roberts. The letter recaps the April 18, 2003 home office visit. The letter states, in part:

> As our CEO [Kirby] said, we do not give exclusives. Currently we have no one else marketing in the brokerage/IMO arena on WRL paper (either fixed life or annuity) outside of Bayfront, relationships brought to us by them, and our ISI distribution. . . .

---

[17] See *infra* Part II.H. for the court's findings regarding Melchert.

Case 1:04-cv-00081-LRR   Document 168   Filed 06/26/07   Page 25 of 55

(Trial Ex. 15). The Brattons understood this to mean that they did not have any particular ownership of the WRL opportunity. Although, from the Brattons' perspective, the iGroup and Life Professionals had the primary distribution deals with AEGON, it was common knowledge in the industry that AEGON did not give exclusives. The letter also reiterated the parties' agreement to avoid channel conflicts—something the parties had discussed since the beginning of their relationship.

On May 15, 2003, the Brattons, Roberts, Dunagan and Johnson all received an email from Hagedorn with the subject line reading: "Update on the WRL Life Product Introduction." (Trial Ex. K). Hagedorn started the email with the salutation: "Good morning sales leaders!" (*Id.*). She discussed seeking approval for WRL's fixed life products from various state insurance departments, and she ended the letter with the following statement: "I am very excited about the potential this group has in both recruiting efforts and life sales, and look forward to helping you all WIN!" (*Id.*).

On May 19, 2003, Gary Bratton sent a three-page letter to Seth Miller and Kneeland, and he sent a copy to Kirby. (Trial Ex. 17). The third paragraph of the letter states:

> We understand that we do not have an exclusive market to WRL fixed products, but we do hope that you will work with us to preserve the integrity of the contract, for the mutual best interest of [WRL] and [the Bratton Companies]. We would ask that you give us the same consideration in marketing [WRL] as you do iGroup and Life Professionals in their efforts with Life Investors and [Peoples Benefit,] respectively. As long as we are doing a good job for you and fulfilling commitments that we have made to you, we ask that you do not give another organization the same contract that we have to market [WRL] fixed life products.
>
>  . . . Specifically, we ask that you do not allow another marketing group to appoint agents/agencies at the RMO

26

(120%) contract level. To do so would undermine our efforts and denigrate the value of the [WRL] contract.

. . .

Thank you for your offer to advance us payments against future commissions, but we do not wish to borrow any money. Our request for a marketing allowance was a request for "soft money" to increase the total payout of your contract. These funds would have been used to offset a portion of the considerable costs involved in setting up a nationwide distribution for WRL fixed products and for growing this distribution in future years. . . . If you feel that our request for marketing assistance is not fair, we will bear these costs. As I said in our visit to Cedar Rapids, the marketing allowance is not a "deal killer," and we fully intend to go forward and do a good job representing [WRL].

(*Id.*). The May 19, 2003 letter also discussed avoiding channel conflicts and how to deal with non-producing agents. (*Id.*). The Brattons received no response from anyone at WRL regarding the May 19, 2003 letter.

### H. Commission Schedule

During the time period between April 18, 2003, and June 15, 2003, the Brattons worked with WRL's Melchert to establish the Commission Schedule for the Bratton Companies' downline agents and agencies. The Brattons first met Melchert in Cedar Rapids during the home office visit on April 18, 2003. Melchert was the department manager in charge of licensing and commission for WRL and WRL's sister companies in Cedar Rapids. Melchert had established similar commission schedules with other IMOs between twelve and fifteen times in his career with AEGON, which began in 1993.

The Bratton Companies' 135% commission level and "Rank 75" was established by others at WRL, but Melchert and Randy Bratton exchanged emails and created the rest of the Commission Schedule, a table titled "Bratton Life." (Trial Ex. 24). The Commission Schedule represents the commission structure that was used once WRL's fixed

27

life products were sold in the market, with one exception. There are six grayed-out lines on the Commission Schedule that were not part of the working Commission Schedule, but rather commission levels that Randy Bratton and Melchert discussed adding in the future. The Commission Schedule was finalized in mid-2003 and memorialized in writing. (Trial Exs. 24 & JX3, at ¶ 34). WRL considered the Commission Schedule to be the "schedule" that is referred to in paragraph one of Randy's Appointment Agreement and the appointment agreement Gary Bratton signed with WRL on July 2, 2003 ("Gary's Appointment Agreement) (Trial Ex. 22). The Commission Schedule covered WRL's Freedom Series, that is, term and universal fixed life insurance products.

The Commission Schedule was never distributed to anyone outside of the Bratton Companies, that is, to the Brattons' downline agents. Agent commission levels are generally determined by the IMO based upon the IMO's assessment of the agent's qualifications. The Brattons did determine their downline agents' commission levels, but they did not use the Commission Schedule to negotiate contracts or commissions with agents. Once the Brattons contracted with an individual agent or agency, they would inform WRL of the particular agent's commission level.

Pursuant to the Commission Schedule, the Brattons received the top level of commission of 135% when they sold a policy. (Trial Ex. JX3, at ¶ 35). Between June of 2003 and the time WRL terminated the Brattons in March of 2004, they were the only individuals who received the 135% commission level. The Commission Schedule first became effective in June of 2003, and it was last updated by Randy Bratton and Melchert in November of 2003. (*See* Trial Ex. 24). The Brattons received override commissions based on the figures in the Commission Schedule when one of their downline agents sold a policy. (*See id.*). The Brattons were never paid under any schedule but the Commission Schedule, that is, they never sold WRL annuities, so they were never paid pursuant to Randy's Annuity Schedule. (*See* Trial Ex. Q).

28

WRL generally has a "signing" policy, which requires that commission schedules be signed by a WRL representative before they are effective. The signing policy protects WRL from agents who claim they have been promised something different than what they actually receive. The Commission Schedule was never signed, but WRL negotiated it with the Brattons and paid them pursuant to it in 2003 and 2004.

### I. June 15, 2003 Products Launch

On June 15, 2003, the Bratton Companies received permission from Hagedorn to begin selling WRL's fixed life products. The Bratton Companies and Bayfront were the only IMOs working with WRL's fixed life products at that time.

In late June of 2003, the Brattons submitted the first application for issuance of one of WRL's fixed life insurance policies. Shortly after the June 15, 2003 release, agents who had been recruited by the Bratton Companies were submitting applications for issuance of WRL's fixed life insurance policies.

### J. Gary's Appointment Agreement

When Gary Bratton wanted personally to write a piece of WRL's fixed life insurance, he entered into Gary's Appointment Agreement, which he signed on July 2, 2003. Gary's Appointment Agreement was nearly identical in substance to Randy's Appointment Agreement.

On July 10, 2003, WRL sent Gary Bratton a letter regarding Gary's Appointment Agreement, which welcomed him to WRL, assigned him an agent number and showed that he was assigned at a Rank 62. Gary Bratton was actually paid at a Rank 75, the IMO level that WRL assigned to the Bratton Companies and is reflected in the Commission Schedule.

Gary Bratton was never given a schedule like Randy's Annuity Schedule (Trial Ex. Q) at any time during his relationship with WRL. The only two schedules that existed were Randy's Annuity Schedule and the Commission Schedule, and the only schedule which was used to pay Randy Bratton or Gary Bratton was the Commission Schedule.

29

### K. Taste of Iowa Meeting

On August 26 and 27, 2003, the Brattons and Roberts came to Iowa for the "Taste of Iowa" meeting, which was a home office visit. (*See* Trial Exs. 18-1 to 18-3). AEGON sets up Taste of Iowa meetings for its new field agents and distributors, because the meeting gives the attendees a chance to meet the home office personnel who will be supporting their businesses. Typically, AEGON hosts between ten and twenty producers at its Taste of Iowa events—enough producers to necessitate chartering a bus to transport them around Cedar Rapids.

At the suggestion of the Brattons, WRL invited several agency distributors to attend the August of 2003 Taste of Iowa meeting. At the last minute, a couple of the invited agency managers became unable to attend. The Brattons and Roberts only had three additional agents join them for the Taste of Iowa meeting—John Scalesse, Cheehon Kim and Vince Gregorio. (Trial Ex. 18-3). Kneeland and Seth Miller were concerned about the relatively small number of attendees who came with the Brattons.

The Taste of Iowa meeting took place in a conference room at the WRL home office. Kirby welcomed everyone and expressed some kind words about the Bratton Companies. In front of the Brattons, Roberts and three agents, Kirby said that AEGON liked to have one IMO be the primary distributor for a group of products or distribution channel. Kirby expressed his love for AEGON and said "this is the last company you will ever need." Kirby had worked for AEGON and its carriers his entire career, and he had been successful, so he was attempting to energize the agents who were new to AEGON.

On August 27, 2003, there was a private lunch in the WRL executive dining room. Such lunch involved Gary Bratton, Randy Bratton, Roberts, Kirby and Hagedorn. The Brattons asked Kirby about how he felt things were going, and he assured the Brattons that they were "doing fine." Kirby stated that he understood that it would take them awhile to get their business up and running, and he mentioned that it took Earl and the iGroup

30

about three years before they had significant consistent production for Life Investors. The Brattons understood Kirby's statements as a boost of confidence in the Bratton Companies.

### L. *Marketing Efforts & Communications*

The Brattons' marketing consisted of making personal telephone calls and using direct mailings and emails. For example, in the October/November 2003 issue of the magazine *Insurance Marketing*, the Bratton Companies purchased a $2,500 two-page advertisement to promote the WRL products ("*Insurance Marketing* Advertisement"). (Trial Exs. P & V). The advertisement stated, in part: "*Announcing* the Product Rollout Event of the Year . . . [WRL], a leader in the variable product industry, is now entering the fixed life market." (*Id.*). WRL's compliance division approved the *Insurance Marketing* Advertisement, as Gary's Appointment Agreement and Randy's Appointment Agreement required.

Throughout 2003, Gary Bratton, Randy Bratton and Roberts made a total of sixteen trips around the country to recruit agents and promote WRL products.

Between the spring of 2003 and March of 2004, Gary Bratton, Randy Bratton and other employees of the Bratton Companies spent about 90% of their time on business related to WRL products. They had non-WRL products available, including products from Great American and Lincoln Benefit, but they did not actively market the other carriers. The Bratton Companies neglected marketing and recruiting for the other insurance companies they represented because they were devoting most of their resources to WRL. The Brattons received commissions when agents in their downline sold non-WRL products, and WRL did not require exclusivity from the Bratton Companies—WRL permitted the Bratton Companies to do business with other insurance carriers and did not require the Brattons to sever any relationships that they had with its competitors. The Bratton Companies were free to engage in marketing and recruiting for non-WRL carriers, and WRL did not direct the Bratton Companies' recruiting and marketing efforts. There were

31

no explicit conversations where the Brattons informed WRL representatives that the Bratton Companies would be expending 90% of their time on WRL, but Kirby told the Brattons, on more than one occasion, that WRL was the "last company [the Bratton Companies] would ever need."

Throughout 2003, the Brattons updated WRL about their marketing efforts and discussed specific instances of channel conflicts. An example of one such update is an email exchange between Gary Bratton, Kneeland and Seth Miller. (Trial Ex. 19). On September 8, 2003, Kneeland wrote, in part: "On a realistic basis, how do you see the last third of the year going for both recruiting, as well as production?" (*Id.*). On September 9, 2003, Gary Bratton replied to Kneeland and Seth Miller:

> [Kneeland], I feel that things are going well. At best I can tell, we've submitted about $250,000 weighted target (Target+excess+5% credit for annuity business) through today. I believe that weighted target number will be $600-$750,000 by the end of the calendar year. As we build momentum, I believe we can still realistically expect to achieve the $3-$5,000,000 number for the first full year. We've had some challenges with product approvals and we're still missing a couple of key states, but I believe all of us can feel the momentum that we're building.
>
> As far as recruiting, we will still concentrate on recruiting at the RMO level, and I would expect to have another 15 RMOs contracted at the end of the calendar year. . . .
>
> It takes a lot of time to start from dollar one/app one, but I believe we're doing OK. As we get more RMOs on board, the growth will accelerate. We're also paying close attention to quality, as we committed to you, but in the long run, this will pay off for all of us. We appreciate all your support. We're focused on the goals outlined in our original business plan, and we're still impressed with WRL! Thanks, Gary [Bratton].

32

(*Id.*). In the insurance industry, it takes a lot of time and resources to convince agents and agencies to sell a new product for a company that has not established its name in the marketplace.

In November of 2003, Gary Bratton informed Kirby, Kneeland and Seth Miller via email that the Bratton Companies had "experienced tremendous results recently with recruiting" because they had recruited five large agencies. (Trial Ex. S-1 to S-2). Gary Bratton also predicted having Rex Synder of the National Brokerage Agency replace the business of many of Synder's member agencies, which had been doing $5,500,000.00 in production for another insurance company. (*Id.* at S-2).

On December 31, 2003, the Bratton Companies sent a memorandum to its "Great American Life agents" that instructed them that Great American was quitting the life insurance business on April 30, 2004, but that WRL's fixed life products could replace what Great American had been offering. (Trial Ex. 21-1). It listed the advantages of WRL's fixed life products and stated that "[t]op contracts" were available "for top producers and recruiters!" (*Id.*).

### M. Bumps in the Road

The Bratton Companies never received the "complete portfolio" of products they requested from WRL in the Proposal and PowerPoint Presentation, because WRL never provided the Bratton Companies with WRL's whole life products. The Brattons, however, concede that WRL provided everything else listed in the PowerPoint Presentation with the exception of the $15,000 monthly marketing allowance, stock options and a stock purchase plan.

Throughout 2003, the Brattons became frustrated by the fact that they could not recruit certain agents, because the agents had prior relationships with other AEGON carriers. AEGON was cognizant of channel conflicts and would not allow the Brattons to recruit agents who had a Life Investors or Peoples Benefit contract. This was frustrating

33

to the Brattons, because AEGON allowed the iGroup and Life Investors to operate under different rules, that is, AEGON allowed agents to simultaneously carry both a Life Investors contract and a Peoples Benefit contract. As a result, some agents who wanted a WRL contract through the Bratton Companies became upset with the Brattons, because the agents did not understand why they were allowed to dual contract with Life Investors and Peoples Benefit, but not with WRL. The Brattons suffered some delay and embarrassment, because they were not allowed to offer WRL contracts to agents or agencies who were already contracted with Life Investors and Peoples Benefit.

Beginning in about August or September of 2003, the Brattons asked WRL to begin putting its forms on "iPipeline." The iPipeline is a subscription-based website service used by brokerage agencies. It is a widely used web tool because it is a repository for forms from various insurance companies. If, for example, an agency is representing several different carriers, an agency need not keep all of the different forms on their own computers, but instead outsource the storage of the forms to iPipeline. When the Brattons attempted to recruit agencies, "several" agencies told them that the agency could not do business with the Bratton Companies unless WRL participated in the iPipeline. WRL representatives never responded to the Brattons' request for iPipeline participation but repeatedly stated that they were still working on it and that they had not yet made a decision on the issue. On February 6, 2004, for example, Randy Bratton emailed Seth Miller and stated that one of the four "top" issues that he wanted to discuss with Seth Miller was getting WRL "forms and quotes on iPipeline." (Trial Ex. M). WRL did not participate in iPipeline before it terminated the Brattons.

In September of 2003, Roberts broke off from the Bratton Companies and started his own brokerage operation. In October of 2003, the Brattons terminated Hall's employment and closed the Ohio office. The Brattons did not inform WRL of those changes. Without prior knowledge of Roberts's split from the Bratton Companies, Kirby

34

received a call from Roberts which "completely blindsided" him. Roberts told Kirby that he was no longer with the Bratton Companies and he asked Kirby for a contract with WRL. Kirby told Roberts that AEGON would not give him a contract with WRL because AEGON was loyal to the Brattons and Bayfront. Immediately after receiving the call from Roberts, Kirby called Gary Bratton and asked him about the situation. Gary Bratton assured Kirby that the Bratton Companies were still on track, even without Roberts. Seth Miller first found out about Roberts's break-off from the Brattons by speaking with Kirby after the fact.

On September 26, 2003, Kneeland stated that he did not believe Roberts should be given a contract with any of WRL's sister companies, namely, Life Investors or Peoples Benefit, because Roberts had complete knowledge of the Bratton Companies' WRL business model. (Trial Ex. H). Such a contract would be a channel conflict and, according to Kneeland, that is not the way AEGON liked to do business.

### N. *Termination*

On January 28, 2004, Kirby resigned as WRL's Chairman and CEO. Ron Wagley was named WRL's new CEO.

Shortly after Wagley became the CEO, Seth Miller visited the Bratton Companies and each of the other IMOs with which he was working, including the iGroup and Life Professionals. When Seth Miller went to Memphis to meet with the Brattons, they discussed the fact that the Brattons' numbers had fallen off in the first quarter of 2004 and that they were not on track to produce the $3,000,000.00 to $5,000,000.00 that they had anticipated and projected.

When Seth Miller returned from Memphis, he discussed each of the IMOs with Wagley and others at WRL. They considered terminating Bayfront and the Bratton

35

Companies because they were not delivering the promised amount of agents or premiums and they were utilizing a fair amount of home office resources.[18]

On March 17, 2004, Seth Miller and Rick Seger, another WRL representative, called Randy Bratton and Gary Bratton. The Brattons had some advance notice that they would be receiving the telephone call, because, on the morning of March 17, 2004, Dunagan and Johnson notified the Brattons that their Bayfront contract with WRL had been terminated unexpectedly. Therefore, the Brattons had some notice that they would be receiving a termination call from WRL representatives. The Brattons prepared a tape-recorder, and Randy Bratton tape-recorded the conversation when Seth Miller and Seger called.

During the telephone conversation, Seth Miller informed the Brattons that WRL had made a business decision to terminate Gary's Appointment Agreement and Randy's Appointment Agreement. Essentially, WRL was ending its relationship with the Bratton Companies, effective thirty days from March 17, 2004. Seth Miller also informed the Brattons that all of the agents that they had recruited would be terminated. The agents would continue to earn commissions on polices that had previously been submitted or issued, but they would no longer be permitted to submit new applications.

The Brattons were very angry with the news because their long-term plans were centered around WRL. They were concerned about their reputations and wasted efforts. At one point during the telephone conversation, Randy Bratton asked Seth Miller:

---

[18] The court does not find evidence in the record to support Gary Bratton's allegation that Seth Miller terminated the Brattons due to David Miller's relationship with Earl, or due to Earl's alleged complaints to AEGON officers about the Brattons' intrusion into the fixed life market.

36

[W]hat kind of criteria are you using to evaluate [your decision] on? Because, you are talking about what basically boils down to, in reality, nine months of, before we actually had product kits that we could mail to the agents. We got a half million in production and 150 agents. [It's] not setting the world on fire, but uh, that's real dollars, and that is our ass out in the public eye, representing you, and uh, you know, the fact that you are pulling the plug after nine months makes us look like a fool. . . . We've marketed this thing entirely on our own certainly *expecting a year, at least a year*, in good faith. You know, [it is] just a baffling decision to me.

(Trial Ex. 27-3 (emphasis added)). During the conversation, Gary Bratton acknowledged that WRL could "legally cancel this contract," but argued that it was not fair, respectful or ethical to do so. (*Id.* at 27-4). There was no discussion of channel conflicts or oral contracts or agreements during the conversation. Aside from the "year" mentioned by Randy Bratton, no one mentioned any specific period of time, including a period of three or five years, that the Bratton Companies would be allowed to sell WRL's fixed life products.

On March 23, 2004, the Brattons provided written notice to their WRL downline agents:

As you are aware, our company has been representing [WRL], a member of the AEGON group of companies, as an [IMO].

After less than a year, despite significant premium production and recruiting successes, WRL has decided to terminate our contract without cause, as well as the agent contracts within our entire distribution chain.

We have been given no explanation for this decision.

We have incurred a great deal of expense in promoting this company and their products, and we are sensitive to the fact that many of you have done the same. While we understand the volatile nature of the life insurance business and its effects

37

on independent agents, this decision appears to be an arbitrary one, without any reasonable basis.

You are receiving this news via [fax or email], because we were told that we had five business days to inform all contracted agents of this decision, before termination letters were to be sent.

We sincerely appreciate your support and the opportunity you have given us to work with you and your organization. We have been in the life brokerage business since 1977, and we are here to stay! We hope to be able to continue working with you. If you would like to discuss the [WRL] situation further or if you would like information on the other companies we represent, please contact Gary [Bratton] or Randy Bratton at (800) XXX-XXXX.

Thanks again.

(Trial Exs. 29-2 & 29-3) (omitting telephone number pursuant to Local Rule 10.1.h). At the time of termination, the Bratton Companies had 146 WRL-contracted agents in their downline. When those agents received the termination news, the vast majority of them discontinued doing business with the Bratton Companies.

Until WRL terminated Gary Bratton without cause on March 17, 2004, he had never been terminated from a life insurance company for which he was producing business. Over the years, both Gary Bratton and Randy Bratton received notices that their appointment agreements would be terminated without cause for lack of production, but Gary Bratton had never heard of an insurance company terminating any agent without cause who had been producing business.

### O. After the Termination

The Brattons remained in the insurance business after they were terminated by WRL.

38

On March 24, 2004, Gary Bratton signed an appointment agreement and commitment letter with AIG Life Brokerage and American General Life Insurance Company (hereinafter collectively "American General"). (*See* Trial Exs. 25-3 to 25-12). The Brattons were contracted at a 130% commission level, which Randy Bratton referred to as a "top deal" when he spoke with his downline agents. Gary Bratton made a "commitment of $1,000,000 of paid annualized life premium credits" in conjunction with his appointment agreement. (Trial Ex. 25-12). The termination provision in the Brattons' contract with American General is standard in the industry; it provides that the Brattons can be "terminated with or without cause" by written notice. (Trial Ex. 25-9, at ¶ VIII(C)).

After WRL terminated the Bratton Companies and its downline agents, nine of those agents re-contracted with WRL. These agents signed new contracts with WRL.

### P. Numbers

Up through March 17, 2004, the Brattons had been paid approximately $86,000.00 in commissions for WRL's fixed life products. The Bratton Companies had recruited 146 agents who had produced about $551,000.00 in submitted premiums in the nine-month period between June 15, 2003, and their termination. They had a total placed weighted premium of $445,000.00. Out of that total placed premium, $223,000.00 was for one individual case that was sold by the Brattons' downline agent, John Scalesse.

The Bratton Companies have never produced $3,000,000.00 in any given calendar year. The Bratton Companies had their best production in 2001, and, that year, they produced just less than $2,700,000.00 in placed weighted premiums with approximately 1,800 to 2,000 agents in their downline. In the four years between 1999 and 2002, the Brattons' total placed weighted premium production was $8,307,336.51. (Trial Ex. 39-5). This total includes annuity products, and it includes the Bratton Companies' production for Surety Life, Lincoln Benefit and Great American.

At any given time, the Brattons had multiple appointment agreements, agent contracts and the like in place. All of the written contracts had termination provisions, typically including a "termination without cause" provision that required thirty days written notice by either party. Compared to other IMOs, the Brattons marketed for very few insurance companies. Typically an IMO will market for thirty or forty insurance companies at one time. The Bratton Companies carried only about six contracts at any given time. (*See* Trial Exs. 38-3 & 38-4).

BFSC's 2003 tax return shows wages and salaries of $182,950.00 (Trial Ex. 32-90) and IMG International's 2003 tax return shows no wages and salaries (Trial Ex. 32-105). IMG International's 2003 tax return shows, however, "other deductions" consisting of $148,093.00. (Trial Ex. 32-105). Of that amount, $46,972.00 were consulting fees, $70,332.00 were management fees and $21,602.00 were commissions. (Trial Ex. 32-113). In 2003, Roberts reported $76,979.00 in "nonemployee compensation." (Trial Ex. 33-2 & 33-3). Therefore, the salaries, wages, consulting fees, management fees and commissions reported by the Bratton Companies in 2003 totaled $321,856.00.

In 2003, the Bratton Companies spent a total of $204,604.00 on "salaries, wages and other compensation" promoting WRL. (Trial Ex. C). That year, the Bratton Companies spent a total of $350,493.00 on total expenses for WRL, including salaries and wages, that were directly attributable to marketing and promoting WRL products and themselves. (*Id.*). During the twelve month period ending on May 31, 2004, the Brattons spent $408,625.00 on recruiting, marketing and promoting WRL products and themselves.[19] These costs included the costs associated with travel—airfares, hotel costs, and meal costs. They also included Hall's salary and benefits. They included costs for

---

[19] During the 2002 calendar year, the Bratton Companies' total expenses that were directly attributable to marketing and promoting WRL products and themselves were $16,619.00; in 2003, they were $350,493.00; and in 2004, they were $53,057.00. (Trial Ex. C). Such expenses totaled $420,169.00. (*Id.*).

Case 1:04-cv-00081-LRR    Document 168    Filed 06/26/07    Page 40 of 55

printed marketing materials, such as a $2,500 two-page advertisement (Trial Exs. P & V) and direct mailings, which ranged anywhere from $997.36 to $1,807.81 per mailing. (Trial Ex. W). Independent contractors generally bear these expenses under an appointment agreement.

### Q.  Other IMOs

The principals of IMOs who worked for non-WRL AEGON carriers, like iGroup and Life Professionals, signed appointment agreements like Gary's Appointment Agreement and Randy's Appointment Agreement. Melchert, AEGON's custodian of records regarding commissions and agent information for AEGON carriers, and Seth Miller are not aware of any agreements that AEGON or AEGON carriers entered into with IMOs, other than the appointment agreements. Moreover, such IMO principals were paid commissions and overrides pursuant to the appointment agreements and corresponding schedules, which Melchert created with the respective principals.

In 2002, the iGroup was the IMO that was marketing on behalf of Life Investors. The iGroup had contracted between 5,000 and 6,000 agents in their downline and were producing between $7,000,000.00 and $10,000,000.00 in life insurance premium. In iGroup's first year, it recruited 2,483 agents, submitted 4,207 applications and had submitted premiums totaling $3,272,523.00.

During the same time period, Life Professionals was the IMO that was marketing on behalf of Peoples Benefit. Life Professionals had contracted between 2,500 and 3,000 agents in their downline and were producing between $3,000,000.00 and $4,000,000.00 in premium each year. In Life Professionals' first year, it recruited 361 agents, submitted 566 applications and had submitted premiums totaling $1,694,672.00.

41

## III. CONCLUSIONS OF LAW[20]

### A. Breach of Contract Claim

#### 1. Integration

"[W]hen an oral agreement precedes a written agreement on the topic, ordinarily it will be found the oral discussion merged into the written agreement." *Commercial Trust & Sav. Bank v. Toy Nat'l Bank*, 373 N.W.2d 521, 523 (Iowa Ct. App. 1985). The "key question" is, however, the intent of the parties. *See id.* ("There must be an indication of intent that the second agreement replaces the first."). "[T]he subsequent written agreement is the final expression when 'the terms thereof are inconsistent with the earlier agreement *and intended to be substituted for it . . .*'." *Id.* (adding emphasis and quoting *S. Tex. Land Co. v. Sorensen*, 202 N.W. 552, 553 (Iowa 1925)). "An agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement." *Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996). "Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence." *Id.* (citing Restatement (Second) of Contracts § 209, cmt. c (1981)). Even when the written agreement lacks ambiguity on its face, "extrinsic evidence is admissible to show whether or not [the] writing is an integrated agreement." *In re Eickman's Estate*, 291 N.W.2d 308, 312 (Iowa 1980).

The court finds that Gary's Appointment Agreement is not an integrated document, because it is not the complete expression of the agreements between WRL and the Bratton Companies. *See Whalen*, 545 N.W.2d at 290. Gary's Appointment Agreement states that

---

[20] The court will not reiterate the parties' arguments, as they are well-documented in the trial transcript, the parties' written closing arguments (docket nos. 162 and 165) and the summary judgment documents and order (docket nos. 99, 104, 108, 110, 112, 116 and 133).

Moreover, the court has previously found that it has jurisdiction over this dispute and the parties agree that Iowa law is applicable. *See* Order, at docket no. 133, Part III.

it will not take effect until WRL has signed a schedule and appointed him. Regardless of whether the Commission Schedule was the schedule referenced in Gary's Appointment Agreement,[21] the court finds that Gary Bratton was paid pursuant to the Commission Schedule (at a Rank 75), accepted such payments and never complained to WRL about the commission he received in 2003 and 2004. The July 10, 2003 letter informed Gary Bratton that Gary's Appointment Agreement entitled him to an appointment at Rank 62. The Brattons' IMO commission level, as shown on the Commission Schedule, is Rank 75, and Gary Bratton was paid at a Rank 75. Therefore, the court finds that WRL and Gary Bratton did not intend for Gary's Appointment Agreement to be the complete agreement between them.

Randy's Appointment Agreement clearly is not the final expression of any agreement that existed between the Bratton Companies and WRL, because it was signed on November 1, 2002, prior to the time the Brattons met Kirby, presented WRL representatives with the Proposal or otherwise discussed any larger marketing arrangement. *See Commercial Trust*, 373 N.W.2d at 523 (explaining that, in order for merger to occur, the oral agreement must *precede* a written agreement). Therefore, Randy's Appointment Agreement did not supplant any oral agreement that may have existed.

### 2. Oral contract

To prove the existence of an oral contract, the Brattons must prove the following elements:

---

[21] The court declines WRL's invitation to determine whether an email from Melchert with a draft of the Commission Schedule attached is an electronic signature under the Uniform Electronic Transfers Act, Iowa Code chapter 554D, because the court relies on other facts to determine that Gary's Appointment Agreement is not a fully integrated document.

> (1) the existence of a contract; (2) the terms and conditions of
> the contract; (3) that [they] performed all the terms and
> conditions required under the contract; (4) [WRL's] breach of
> the contract in some particular way; and (5) that [they]
> suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998); *see also Wagner Enters., Inc. v. John Deere Shared Servs., Inc.*, 397 F. Supp. 2d 1097, 1104-05 (N.D. Iowa 2005). "To prove the existence of an oral contract, the terms must be sufficiently definite for a court to determine with certainty the duties of each party, the conditions relative to performance, and a reasonably certain basis for a remedy." *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998). "[W]hen the terms are not definite, courts are reluctant to impose reasonable terms on contracting parties." *Id.* However, the agreement must only be certain (not absolutely certain) and unequivocal in its essential terms. *In re Price*, 571 N.W.2d 214, 216 (Iowa Ct. App. 1997). For an "oral contract to be found and enforceable, the terms must be so definitely fixed so that nothing remained except to reduce the terms to writing." *Id.* However, when an oral contract appears to exist, Iowa courts are "reluctant to find it too uncertain to be enforceable." *Gallagher*, 587 N.W.2d at 617.

The court concludes that Kirby, as WRL's Chairman and CEO, entered into an oral agreement with the Brattons that permitted them to market WRL's fixed life products and recruit insurance agents and agencies to sell those products. Based on the Proposal, the Commission Schedule, and the in-person, telephonic and email discussions between WRL representatives (including Kirby) and Gary Bratton, Randy Bratton and Roberts that occurred between November of 2002 and June of 2003, the court finds that an oral contract existed. *Wagner Enters.*, 397 F. Supp. 2d at 1104. The oral agreement, in relevant part, consisted of numerous terms, conditions and duties, including, but not limited to, the following:

44

1. WRL promised to pay the Brattons at the 135% commission level, or Rank 75, rather than the 140% commission level that the Brattons first requested in the Proposal;

2. WRL promised to allow the Brattons to be its primary IMO for WRL's rebranded fixed life products so long as the Bratton Companies reached the projected results, as set forth in the Proposal, that is, producing $3,000,000.00 to $5,000,000.00 of fixed life premium volume by June 15, 2004;

3. WRL agreed to refrain from paying any other IMO at the 135% commission level;

4. In exchange, the Bratton Companies agreed to expend their own time and money to market WRL's fixed life products and recruit agents to sell them (without a monthly marketing allowance), and they agreed to do enough marketing to meet the sales projections included in the Proposal;

5. The parties agreed to channel conflict rules, that is, they agreed that the Brattons would not recruit agents who were already selling Life Investors's fixed life products and Peoples Benefit's fixed life products, *i.e.,* those agents and agencies who were already contracted with the iGroup and Life Professionals;

6. The Bratton Companies agreed to have Gary Bratton, Randy Bratton and Roberts as the principals who would lead the efforts to market WRL's products;

7. The Bratton Companies agreed to have Hall be the recruiting manager who would be a main line of communication with new WRL agents;

8. The Bratton Companies agreed to maintain three offices—in Tennessee, Ohio and Michigan—in order to accomplish the production numbers projected in the Proposal;

9. WRL agreed that the Bratton Companies could continue to sell products and market for other insurance companies; and

45

10. The parties agreed that either party could be terminated with or without cause upon thirty days written notice.

The Brattons have established elements one and two of their breach of oral contract claim, because they have shown that a contract existed and that the terms are sufficiently definite to be enforceable. *Wagner Enters.*, 397 F. Supp. 2d at 1104-05 (explaining that element one is the "existence of a contract" and element two is "the terms and conditions of the contract"); *Gallagher*, 587 N.W.2d at 617.

However, the Brattons did not establish the third breach of contract element. *Molo Oil Co.*, 578 N.W.2d at 224-25 (noting that the third breach of contract element in Iowa requires performance). The Brattons have not shown that they performed as required by the terms of the contract. Specifically, after September of 2003, Roberts was no longer a principal with the Bratton Companies and, after October of 2003, Hall was no longer employed by the Bratton Companies as a recruiting manager. The Ohio office was no longer operational. The Brattons and Roberts parted ways, and the Brattons terminated Hall's employment. Nevertheless, the Brattons failed to inform WRL of that important development. The oral contract was conditioned on Roberts's participation as a principal of the Bratton Companies, due to his status as a former Great American employee who had established relationships with many agents and agencies who were formerly affiliated with Great American before it left the life insurance business. The court concludes that WRL representatives played no part in Roberts's decision to leave the Bratton Companies. In fact, one of the Brattons' main contacts at WRL—Seth Miller—learned of Roberts's departure through Kirby, rather than from the Brattons themselves. WRL did not prevent the Brattons from retaining Roberts as a principal or Hall as the recruiting manager. *Cf. Jerry Palmer Homes, Inc. v. Simpson*, No. 05-0162, 720 N.W.2d 191, 2006 WL 1230018, at *3 (Iowa Ct. App. 2006) (unpublished) (explaining that, "[i]f one party to a contract prevents the other from performing a condition of the contract or fails to cooperate to

46

allow the condition to be satisfied, the other party is excused from showing compliance with this condition"). The Brattons' failure to have a third principal and a marketing and recruiting manager who worked to market WRL's fixed life products was a failure to perform. *Molo Oil Co.*, 578 N.W.2d at 224-25.

Additionally, conditions of the contract were not met when the Brattons failed to meet their sales projections. The Brattons were not marketing and recruiting enough or well enough to meet their sales projections; they did not perform the "plug and play" pursuant to the Proposal. The Brattons failed to bring an adequate number of agents to the Taste of Iowa meeting—they brought three agents instead of the ten to twenty AEGON usually hosted. The Brattons did not have "several hundred agents ready to sell, right out of the gate" on June 15, 2003, as Gary Bratton predicted on January 21, 2003. (Trial Ex. 8-1). Instead, they only had 146 agents in their downline by March of 2004. The Brattons did not live up to their agreement, because they did not produce the projected $500,000.00 to $1,000,000.00 in target premium during months four through six of production. (Trial Ex. 4-7). Instead, by March of 2004, which was month nine of production, they had only submitted $551,000.00 worth of policies, with a total placed weighted premium of $445,000.00.

The court further concludes that WRL did not prevent the Brattons from meeting their sales projections and, in turn, their contractual obligations. *Cf. Jerry Palmer Homes, Inc.*, 2006 WL 1230018, at *3. In January of 2003, the Brattons knew that they would be prohibited from engaging in channel conflicts with WRL's sister carriers; such restriction was part of the negotiations from the very first meeting on January 15, 2003. Therefore, although the Brattons attempt to blame their lack of performance on WRL's channel conflict rules and WRL's failure to give agents dual contracts, the court concludes that the Brattons were aware of WRL's stringent channel conflict rules at the time they made their projections. Moreover, the Brattons cannot be heard to blame their lack of success on

47

WRL's failure to implement iPipeline, because iPipeline was not included in the list of things that the Brattons needed or expected from WRL in the Proposal or at anytime prior to the June 15, 2003 products launch.

For the foregoing reasons, the court finds in favor of WRL on the Brattons' breach of oral contract claim.[22]

### B. *Promissory Estoppel Claim*

Promissory estoppel is based on the theory that parties should be made liable for their promises even though no consideration existed, a requirement under contract law. *Kolkman v. Roth*, 656 N.W.2d 148, 152 (Iowa 2003). To prove promissory estoppel, the Brattons must show:

> (1) a clear and definite promise; (2) the promise was made with the promissor's clear understanding that the promisee was seeking assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his or her substantial detriment in *reasonable* reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

---

[22] Despite the court's legal conclusions that an oral contract with definite terms existed, it shall go on to consider whether the Brattons are entitled to recover on their claims of promissory estoppel, implied-in-fact contract and unjust enrichment. The court certainly recognizes that "[a] quasi-contractual recovery is . . . barred when allowing one would conflict with a specific provision of an express contract." *Rambo Assocs., Inc. v. S. Tama County Cmty. Sch. Dist.*, No. 06-1695, 2007 WL 1556731, *8 (8th Cir. May 31, 2007) (citing *Smith v. Stowell*, 125 N.W.2d 795, 800 (Iowa 1964)); *see also Giese Const. Co. v. Randa*, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994) ("One who pleads an express oral contract cannot ordinarily recover under an implied contract or quantum meruit. An express contract and an implied contract cannot coexist with respect to the same subject matter, and the law will not imply a contract where there is an express contract." (citations omitted)); *cf. Frontier Props. Corp. v. Swanberg*, 488 N.W.2d 146, 150 (Iowa 1992) (finding no double recovery in a judgment on both express and implied contract theories where the contracts covered different subject matters).

48

*Id.* at 155 (emphasis added); *see also Nat'l Bank of Waterloo v. Moeller*, 434 N.W.2d 887, 889 (Iowa 1989) (noting that the burden of proof to establish estoppel is on the party asserting estoppel). Iowa law requires strict proof of each of these four elements. *Kolkman*, 656 N.W.2d at 156. "Clearly, much more than mere nonperformance of a promise must be shown to obtain the benefits of promissory estoppel." *Id.* The Iowa Supreme Court has noted that, "in applying this doctrine [of promissory estoppel,] each case must be decided in the light of its surrounding facts and circumstances. There can be no hard and fixed rule for determining when it is appropriate." *Johnson v. Pattison*, 185 N.W.2d 790, 795 (Iowa 1971).

The Iowa Supreme Court has examined the phrase "clear and definite promise":

> A "promise" is "a declaration . . . to do or forbear a certain specific act." *Black's Law Dictionary* 1213 (6th ed. 1990). A promise is "clear" when it is easily understood and is not ambiguous. *See Webster's Third New International Dictionary* 419 (unab. ed. 1993). A promise is "definite" when the assertion is explicit and without any doubt or tentativeness. *See id.* at 592.

*Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 50-51 (Iowa 1999). The Iowa Supreme Court has emphasized "clarity" and "inducement" with regard to prong one. *See Nat'l Bank of Waterloo*, 434 N.W.2d at 889 (summarizing Iowa cases and noting that "[t]his dual emphasis on clarity and inducement parallels the Restatement (Second) [of Contracts'] definition of an agreement for purposes of promissory estoppel as '[a] promise which the promisor should reasonably expect to induce action . . . on the part of the promisee"). Moreover, a representation, as opposed to a promise, is "'a statement . . . made to convey a particular view or impression of something with the intention of influencing opinion or action.'" *Schoff*, 604 N.W.2d at 51 (citing *Webster's Third New International Dictionary* 1926 (unab. ed. 1993)).

49

There are a series of alleged statements here upon which the Brattons contend they relied. Kirby, Kneeland and Seth Miller made oral statements pertaining to the Brattons' marketing of WRL's fixed life products several times between November 7, 2002, and August 27, 2003. Such oral statements came in the context of negotiations involving written correspondence in the form of letters and emails, slide presentations, telephonic conferences and individual telephone conversations in which the parties discussed the details of the Brattons' involvement in the sale of WRL's fixed life products and their recruitment of agents and agencies to sell those products.

In the Counterclaims, the Brattons allege that WRL made the following promises: (1) the Brattons would be treated the same as iGroup and Life Professionals, (2) the Brattons would be given sufficient time to market and recruit agents and agencies to sell WRL's fixed life products in the open market, (3) the Brattons would have an exclusive right to market or recruit agents and agencies to sell the products during a five-year period of time and (4) WRL would direct all inquiries it received from agents or agencies related to the sale of WRL's fixed life products to the Brattons during the five-year period.

Assuming without deciding that the WRL representatives made one or more "clear and definite" promises to the Brattons, the court concludes that the Brattons have not proven elements three and four of their promissory estoppel claim by a greater weight of the evidence. Focusing on the third element, the court concludes that the Brattons did not act to their substantial detriment in reasonable reliance on the alleged oral contract, because their reliance was not reasonable. *See Kolkman*, 656 N.W.2d at 156 (requiring "strict proof of a promise that justifies reliance by the promisee"). The evidence proves that Gary Bratton and Randy Bratton were commercially sophisticated businessmen who, together, had over fifty years of experience in the insurance industry. Additionally, prior to Gary Bratton's entry into the insurance industry, he obtained an MBA and was a CPA who worked for a total of six years at two nationally prominent accounting firms. Further,

50

Gary Bratton had served as the Chief Financial Officer and Vice President of Finance at a public company. Gary Bratton and Randy Bratton established their own business, formed Delaware corporations and worked with agents from nearly ever state in the country.[23] In sum, the Brattons were savvy businessmen who should have known to obtain promises and agreements in writing. This is evidenced by the fact that, in November of 2002, Gary Bratton signed the AI Marketing Contract with American Investors, which detailed a marketing relationship similar to the one that they are alleging they had with WRL. (*See* Trial Exs. 25-15 to 25-21). The AI Marketing Contract came complete with an "Independent Marketing Organization Commission Schedule" and a letter confirming its effective date.[24] The Brattons did not reasonably rely on Kirby, Kneeland and Seth Miller's optimistic comments regarding future business. Commercially reasonable behavior would have involved a request by the Brattons to enter into a written marketing agreement prior to the time they expended hundreds of thousands of dollars and enormous amounts of time marketing WRL's fixed life products.

Moreover, the Brattons have not proven element four of a promissory estoppel claim, that is, they have not proven that "injustice can be avoided only by enforcement of the promise." *Kolkman*, 656 N.W.2d at 156. The Brattons' actions were not reasonable and WRL did not know, nor could they foresee, that the Brattons had virtually abandoned their other carriers in favor of promoting WRL's fixed life products. *See id.* at 156 & n.4

---

[23] The Bratton Companies' website, http://www.brattoncompanies.com, provides further evidence of the Brattons' success and sophistication. (*See* Trial Exs. 38-1 to 38-7).

[24] There is also abundant evidence that the Brattons had engaged in several contracts with various insurance carriers, which appointed them to managerial-type positions. For example, they had written agreements that named them area sales managers, executive sales directors, executive general agents, general agents, master brokerage agents and regional directors. *See generally supra* Part II.B. Such written agreements detailed the terms they had with their respective carrier.

51

(adopting the Restatement (Second) of Contracts § 139 which provides that "the significant circumstances to consider in determining whether [element four is met]" includes considerations of "the reasonableness of the action" and "the extent to which the action . . . was foreseeable by the promisor"). It is not unjust to require the Brattons, long-time entrepreneurs and business owners, to reduce their marketing agreement to writing. *See Kolkman*, 656 N.W.2d at 156 & n.4 (noting that promissory estoppel "requires strict proof that the reliance inflicted injustice that requires enforcement of the promise"). There is no equitable basis for enforcing the promises that the WRL representatives made to the Brattons.

The court finds in favor of WRL on the Brattons' promissory estoppel claim.

### C. Implied-in-Fact Contract for Services *(Quantum Meruit) Claim*

*Quantum meruit* claims are "grounded in the realm of pure contract." *Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). Further, "the antiquated term *quantum meruit* is actually used to denote a particular subclass of implied-in-fact contracts—an implied-in-fact contract to pay for services rendered." *Id.* (italics in original). Therefore, *quantum meruit* claims are guided by contract principles and successful plaintiffs may recover "for the reasonable value of the services provided and the market value of the materials furnished." *Id.*

The Iowa Supreme Court has stated that, in order to find an implied-in-fact contract to pay for services, the party seeking recovery must show the following:

> (1) the services were carried out under such circumstances as to give the recipient reason to understand: (a) they were performed for him and not some other person, and (b) they were not rendered gratuitously, but with the expectation of compensation from the recipient; and (2) the services were beneficial to the recipient.

*Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 652 (Iowa 2004) (citations and emphasis omitted). Sometimes, an offer can be accepted by silence. *See id.* at 651. The

Restatement (Second) of Contracts provides:

> Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance. . . . The exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.

Restatement (Second) of Contracts § 69, cmt. a (1981). The Iowa Supreme Court cited and expressed approval for this Restatement comment in *Roger's Backhoe*, 681 N.W.2d at 651, and affirmed the lower court's finding that the offeree's silence established acceptance in an implied-in-fact contract. *Id.*

The court concludes that the Brattons have not proven their claim for *quantum meruit*, or breach of an implied-in-fact contract for services. The court concludes that, although the Brattons reasonably had some expectation for compensation from WRL for their marketing services, they were compensated pursuant to the Commission Schedule. The Brattons knew that they would bear all marketing expenses and that they would not be given a monthly marketing allowance—such agreement was memorialized in Randy's Appointment Agreement, Gary's Appointment Agreement and several letters and emails that the parties exchanged prior to the June 15, 2003 product launch. Therefore, the Brattons have not shown by the greater weight of the evidence that they are entitled to the "reasonable value of the services provided" because they were already paid 135% commission, which totaled about $86,000.00, pursuant to the Commission Schedule.

The court finds in favor of WRL on the Brattons' breach of an implied-in-fact contract for services claim, or *quantum meruit* claim.

### D. Unjust Enrichment Claim

Unjust enrichment claims have been "placed in the equitable sphere of quasi contract." *Iowa Waste Sys., Inc.*, 617 N.W.2d at 29. "Unjust enrichment . . . is not grounded in contract law but rather is a remedy of restitution." *Id.* "Damages under a

53

claim of unjust enrichment are limited to the value of what was inequitably retained. *Id.* at 30.

To establish the elements of unjust enrichment, the Brattons must be able to show the following:

> (1) [the Brattons] conferred a benefit upon [WRL] to [the Brattons'] own detriment,
>
> (2) [WRL] had an appreciation of receiving the benefit,
>
> (3) [WRL] accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value, and
>
> (4) there is no at-law remedy that can appropriately address the claim.

*Id.* (citing *Irons v. Cmty. State Bank*, 461 N.W.2d 849, 855 (Iowa Ct. App. 1990)). The Brattons' unjust enrichment claim is based on the allegation that the Brattons "expended time, money and resources advertising and marketing [WRL's] fixed life product[s]."

The court concludes that the Brattons have not established element three of their unjust enrichment claim. As early as May 19, 2003, the Brattons knew that WRL would not pay them additional money for expenses. (*See* Trial Ex. 17 (expressing the Bratton Companies' intention to go forward without the $15,000.00 monthly marketing allowance)). There is no inequity, because the Brattons' advertisements for WRL also contained the Bratton Companies' logo and contact information. The Brattons' recruiting efforts were not wasted, because, after their WRL termination, they received a "top deal" with American General, in which the Brattons signed-on at a 130% commission level. Again, the Brattons did receive "return payment" for the work the Brattons performed, because WRL paid them according to the negotiated Commission Schedule.

Accordingly, the court finds in favor of WRL on the Brattons' unjust enrichment claim.

54

## IV. JUDGMENT

The court finds that the Brattons have not proven any of their counterclaims against WRL. The Brattons are entitled to no damages, either legal or equitable.

For the foregoing reasons, it is **HEREBY ORDERED:**

(1) The court **DENIES** as moot Plaintiff/Counterclaim Defendant Western Reserve Life Assurance Company of Ohio's oral Rule 52(c) Motions (docket no. 157);

(2) The court **FINDS** in favor of Plaintiff/Counterclaim Defendant Western Reserve Life Assurance Company of Ohio on its declaratory judgment (docket no. 2-1);

(3) The court **FINDS** in favor of Plaintiff/Counterclaim Defendant Western Reserve Life Assurance Company of Ohio on each of the four counterclaims (docket no. 83) brought by Defendants/Counterclaim Plaintiffs G. Randall Bratton, Bratton Financial Services Corporation, Bratton International, Inc. and Betty Bratton as personal representative of the estate of Gary G. Bratton;

(4) The Clerk of Court is directed to **ENTER JUDGMENT** in favor of Plaintiff/Counterclaim Defendant Western Reserve Life Assurance Company of Ohio; and

(5) Each party is directed to bear its own costs.

**IT IS SO ORDERED.**

**DATED** this 26th day of June, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

55